**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| |
|---|
| ACCOUNTABILITY NOW USA, |
| |
| *Plaintiff*, |
| |
| v. |
| |
| KEVIN GRIESS, *Superintendent of the National Mall and Memorial Parks*, *et al.*, |
| |
| *Defendants*. |

Civil Action No. 26-1385 (RDM)

## <u>MEMORANDUM OPINION</u>

Plaintiff, an unincorporated association that maintains a 24/7 demonstration calling for the impeachment and removal of President Donald Trump on National Park Service ("NPS") land, moves for an emergency order temporarily restraining the Superintendent of the National Mall and Memorial Parks Kevin Griess and the Secretary of the Interior Doug Burgum or their delegees "from taking enforcement action against them because of their display of a flag with the legend '8647.'"  Dkt. 10 at 1.  For the reasons that follow, the Court will grant Plaintiff's motion.

### I. BACKGROUND

At least at this early stage of the litigation, many of the relevant facts are uncontroverted. Plaintiff Accountability NOW USA ("Accountability Now") is an unincorporated association that holds a permit from the NPS to conduct "a demonstration near the George Meade Statue on Constitution Avenue in Washington, D.C."  Dkt. 8-1 at 1 (Carey Decl. ¶¶ 1–2).  "Volunteers maintain the demonstration twenty-four hours a day, seven days a week" at which they "engage in face-to-face conversations with members of the public[] to call attention to the rise of fascism in the United States and [to] demand the impeachment of President Trump."  *Id.* (Carey Decl.

¶ 2).  Plaintiff's "current permit was issued on April 13, 2026, and is valid through August 12, 2026[,]" and Plaintiff "intends to obtain another permit when the current permit expires, at the same or another location on NPS-managed land in the District of Columbia."  *Id.* at 2 (Carey Decl. ¶ 3).

On February 24, 2026, in response to reporting "that the Justice Department was withholding more than 50 pages of FBI interviews with a woman who had accused Donald Trump of sexually abusing her when she was a minor[,]" Plaintiff began to display two new signs at the demonstration.  *Id.* (Carey Decl. ¶ 4).  One sign read: "TRUMP RAPED LITTLE GIRLS."  *Id.*  The other read: "KIDS, IF YOUR PARENTS ARE MAGA, THEY LOVE CHILD RAPISTS."  *Id.*  According to Plaintiff, "[t]he display of those signs has engendered numerous conversations between volunteers and passersby regarding President Trump's behavior, morality, and fitness to continue in office."  *Id.*

On April 14, 2026, an NPS agent emailed Anita Carey, an organizer with Accountability Now who is listed as the "Person in Charge" on Plaintiff's permit, Dkt. 17 at 1 (Pl.'s Ex. 1 at 1), relaying the following message from Defendant Superintendent Griess:  "Based on the photographic evidence from earlier today, the [Plaintiff's] first amendment permit is displaying unprotected obscenity in signs or media.  This is not protected by the first amendment and is therefore prohibited and a violation of law."  Dkt. 8-1 at 2–3 (Carey Decl. ¶ 5).  That same day, Carey responded to Superintendent Griess directly, "seeking clarification of NPS's position and asking, in particular, why NPS believes the signs meet the legal definition of obscenity and what would happen if the signs remain on display."  *Id.* at 3 (Carey Decl. ¶ 6).  Griess responded as follows on April 15, 2026:

Thank you for your message.  We appreciate your cooperation as we work to ensure that all permitted activities remain in compliance with federal requirements.

To clarify, the material displayed under your permit has been evaluated under all appropriate standards and tests and is deemed unprotected obscenity, which the Court has established is not protected by the First Amendment. This determination is supported by federal law which prohibits obscene material on federal property.

Because obscenity is unlawful on federal land, we must ask that the material be removed.

The National Park Service may impose and enforce permit conditions to prevent unlawful conduct, including the display of obscene materials prohibited under federal law.  All activities conducted under an NPS permit must remain lawful and in compliance with permit conditions.  If a permittee chooses not to comply with a lawful direction to cease prohibited conduct, the National Park Service may take further steps as appropriate to ensure compliance.

*Id.* (Carey Decl. ¶ 7).

"Based on these communications and the recent experiences of other NPS permit holders whose demonstrations were critical of President Trump," Accountability Now concluded that it faced "a realistic and imminent threat that its demonstration permit [would] be summarily revoked or its signs removed, with minimal or zero notice" and that "[r]evocation [might] result in the destruction of its valuable property, including its tents, tables, chairs, sound equipment, and literature."  *Id.* (Carey Decl. ¶ 8).  In particular, Plaintiff concluded "Defendant Greiss's message that the signs were 'unlawful' and that NPS would 'take further steps as appropriate to ensure compliance'" meant that the NPS would either "summarily revoke its permit and dismantle its demonstration or [would] remove the signs with little or no notice."  *Id.* at 4 (Carey Decl. ¶ 10).  "[I]n order to forestall" such an "enforcement action," Plaintiff "temporarily removed the signs" at issue, filed this lawsuit, and unsuccessfully attempted to negotiate a resolution of the dispute with the NPS.  *Id.* (Carey Decl. ¶ 11).  Plaintiff filed a motion for a preliminary injunction on May 26, 2026, Dkt. 8, seeking an order barring Defendants from

3

"taking any action" against Plaintiff "in retaliation" for displaying the two signs, "including

revocation of Plaintiff's demonstration permit or seizure of [the] signs."  Dkt. 8-2 at 1.

In addition to the two signs discussed above, Plaintiff began displaying a red, white, and

blue flag, which Plaintiff purchased from Amazon, that read "8647."  Dkt. 10-2 at 1–2 (2d Carey

Decl. ¶¶ 3–5).  Although the record is unclear about precisely when the flag first appeared, the

record shows that it was on display by the morning of May 12, when two Secret Service officers

approached a volunteer at the demonstration and engaged in the following brief conversation:

| | |
|---|---|
| Officer: | How are you? |
| Volunteer: | I'm good.  I'm recording this 'cause they told me to. |
| Officer: | That's fine. |
| Volunteer: | How's it going? |
| Officer: | Not a problem.  Just so you're aware, this is all consensual[.] |
| Volunteer: | Yeah[.] |
|  . . . | |
| Officer: |  . . . we received a phone call because of the flag, in fact the 86 47 and what it can stand for. |
| Volunteer: | Uh-huh.  I never heard of it standing for anything other than Trump shouldn't be in office. |
| Officer: | OK.  Alright.  So you have no ill-will towards . . . |
| Volunteer: | I want Trump to live forever and rot in jail where he belongs. |
| Officer: | OK.  That's it.  That's all, all I needed to know[.] |
| Volunteer: | OK[.] |
| Officer: | We just, we got a call so we just wanted to come down here . . . |
| Volunteer: | I'm sorry someone wasted your time[.] |

Officer.        Oh, you're good.  You're good.  It's part of our job[.]

Volunteer:     Yup[.]

Officer:        We just want to make sure that your First Amendment rights are
                protected.  They were concerned, so we just want to make sure
                there's no ill-will.

Volunteer:     OK.  Haha.  Thank you so much.

Officer:        Alright.  Yes, ma'am.

Volunteer:     OK.

Dkt. 15 at 2–3 (https://photos.app.goo.gl/MyS5T7g7b4JXRYmY6).

Things took a turn for the more confrontational when two different officers approached the same volunteer about 25 minutes later and read her the *Miranda* warnings.  *Id.* at 3.  The volunteer was not in custody at the time, and, despite the officer's representation, her right to court-appointed counsel had not attached.  Although politely delivered, the message was a worrisome one—that is, she was at risk of criminal prosecution for displaying the flag. Understandably, the volunteer declined to speak with the officers.  *Id.*  The Secret Service opened an investigation into the volunteer as a "potential threat."  Dkt. 13-1 at 4 (Quinn Decl. ¶ 10).  "[The] investigation remains ongoing."  *Id.*

Nothing happened, however, for another two weeks.  But then, "[o]n Tuesday, May 26, . . . the Secret Service shared information with the U.S. Department of the Interior about its ongoing investigation relating to the individual holding a flag displaying the statement '8647' on May 12 in the 300 block of Constitution Avenue, N.W."  Dkt. 16 at 1–2 (citation modified).  The following day—and less than 24 hours after Plaintiff moved for a preliminary injunction regarding the two signs—"four cars of U.S Park Police officers pulled up to Plaintiff's

5

demonstration site" at around 5 a.m. on May 27, and an officer read "the volunteer on duty" the following "from a clipboard:"

> 18 U.S. Code 8741[.]  Threats against the President.  Right now, we're looking at the 8647 as a threat against the President.  Can I ask you to take it down please?  The sign here?

Dkt. 10-2 at 1 (2d Carey Decl. ¶ 2).  All agree that no such provision of the U.S. Code exists and that the officer presumably intended to refer to 18 U.S.C. § 871, Dkt. 10 at 2; May 28, 2026 Hrg. Tr. (Rough at 28), which makes it a felony to "knowingly and willfully" threaten "to take the life of . . . or to inflict bodily harm upon the President of the United States."  In any event, Defendants do not dispute that "on May 27, the government ordered that the flag be taken down[,]" Dkt. 16 at 2; that the volunteer on duty did so, Dkt. 10-2 at 1 (2d Carey Decl ¶ 2); or that the officer told the volunteer to "please refrain from putting it back up" and warned that, "[i]f it comes back up[,] we'll be by here again, OK, and then it will be a violation of the permit," *id.*; *see also* Dkt. 10 at 1 (https://photos.app.goo.gl/jtM8Tj7sCnkS4Smg9).

Later that day, Plaintiff filed an amended complaint adding the flag incident as part of its First Amendment challenge to the threatened revocation of Plaintiff's permit and required removal of Plaintiff's two signs.  *See* Dkt. 9 at 6–7 (Am. Compl. ¶¶ 22–26).  Plaintiff simultaneously moved for a temporary restraining order ("TRO") to "prevent Defendants from taking enforcement action against [it] because of [its] display of" the flag.  Dkt. 10 at 1.  The following day, the Court heard argument on the motion.  *See* Min. Entry (May 28, 2026). Because Defendants' counsel was unable to offer any description of the agency's actual reasons for concluding that Plaintiff's specific display of the flag posed a true threat—as opposed to conveying a political message urging President Trump's removal from office—the Court provided the parties with an opportunity to supplement the record, *see id.*, and specifically requested that Defendants submit evidence or records addressing their decision-making process

regarding the direction that Plaintiff remove the flag.  May 28, 2026 Hrg. Tr. (Rough at 38, 43, 46).  Both parties made additional submissions.  Dkts. 15, 16, 18, & 19.

## II. ANALYSIS

"A [TRO] is "an extraordinary form of relief," *Banks v. Booth*, 459 F. Supp. 3d 143, 149 (D.D.C. 2020), which is evaluated using the same "factors applicable to preliminary injunctive relief" and which, accordingly, "may only be awarded upon a clear showing that the plaintiff is entitled to such relief," *id.* (second quoting *Sherley v. Sebelius*, 644 F.3d 388, 392 (D.C. Cir. 2011)).  To obtain a TRO, a movant "must show that (1) it is likely to succeed on the merits; (2) it is likely to suffer irreparable harm in the absence of preliminary relief; (3) the balance of equities tips in its favor; and (4) the issuance of a preliminary injunction is in the public interest." *Alpine Sec. Corp. v. Fin. Indus. Regul. Auth.*, 121 F.4th 1314, 1324 (D.C. Cir. 2024) (citation modified).

Although "the movant has the burden to show that all four factors, taken together, weigh in favor of the injunction," *Abdullah v. Obama*, 753 F.3d 193, 197 (D.C. Cir. 2014) (citation modified), likelihood of success on the merits and irreparable harm "are of particular importance."  *Corp. for Pub. Broad. v. Trump*, 786 F. Supp. 3d 142, 149 (D.D.C. 2025). Plaintiff's likelihood of success on the merits is a "key issue [and] often the dispositive one" at the TRO stage, *Greater New Orleans Fair Hous. Action Ctr. v. U.S. Dep't of Hous. & Urb. Dev.*, 639 F.3d 1078, 1083 (D.C. Cir. 2011), and "[w]hen a plaintiff has not shown a likelihood of success on the merits, there is no need to consider the remaining factors" for a TRO, *id.* at 1088. Similarly, "[a] movant's failure to show any irreparable harm is . . . grounds for refusing to issue a [TRO]" regardless of the other three factors.  *Chaplaincy of Full Gospel Churches v. England*, 454 F.3d 290, 297 (D.C. Cir. 2006).

7

The Court, accordingly, starts with the merits, then turns to irreparable harm, and, finally, addresses the remaining factors.  Because the present motion seeks only a temporary restraining order, the parties will be free to develop a more complete record at the preliminary injunction and summary judgment stages of the proceeding.

**A.      Likelihood of Success on the Merits**

This case implicates two fundamental principles essential to a free country.  First, content-based restrictions on political speech in a public forum—particularly restrictions that are premised on the ad-hoc impressions or views of government officials—are inherently suspect.[1] In the words of the Supreme Court, "content-based laws—those that target speech based on its communicative content—are presumptively unconstitutional and may be justified only if the government proves that they are narrowly tailored to serve compelling state interests."  *Reed v. Town of Gilbert*, 576 U.S. 155, 163 (2015) (citations omitted); *Archdiocese of Washington v. Washington Metro. Area Transit Auth.*, 897 F.3d 314, 322 (D.C. Cir. 2018) ("To enforce a content-based exclusion in a public forum, the regulation must satisfy strict scrutiny." (citation omitted)).  Second, true threats to the life or safety of government officials are intolerable.  Full and open debate is necessary for democracy to work.  But there is nothing democratic about seeking political change or influence through threats of violence.  "True threats of violence," like

---

[1]  Plaintiff contends, and Defendants do not dispute, that the NPS-managed property by the General Meade statue on Constitution Avenue constitutes a traditional public forum, s*ee* Dkt. 9 at 1—that is, a "place[] which by long tradition or by government fiat ha[s] been devoted to assembly and debate," such as streets and parks, where "the rights of the state to limit expressive activity are sharply circumscribed."  *Perry Educ. Ass'n v. Perry Loc. Educators' Ass'n*, 460 U.S. 37, 45 (1983).  Indeed, the NPS issued Plaintiff a permit for "[a] 24/7 Vigil to Exercise [its] First Amendment Rights" at the George Meade Statue, Dkt. 17 at 1 (Pl.'s Ex. 1 at 1), and expressly authorized the participants "to exercise their first amendment rights" at the site, *id.* at 2 (Pl.'s Ex. 1 at 2).  The site is in front of the courthouse, open to the public, within sight of the Capitol, and just steps away from the National Mall.

criminal incitement, are not protected by the First Amendment, *Counterman v. Colorado*, 600 U.S. 66, 72 (2023), and "may [be] prohibit[ed] . . . without raising any Constitutional problem," *Free Speech Coal., Inc. v. Paxton*, 606 U.S. 461, 471 (2025) (citation modified).  Here, neither party disagrees with either of these principles.

The parties' disagreement, instead, turns on whether Plaintiff's display of the "8647" flag constitutes protected speech, as Plaintiff asserts, or a "true threat" to the life or safety of the President (or an incitement to violence), as Defendants maintain.  At oral argument, both sides agreed that context is dispositive.  Not every use of the slang phrase "86" constitutes a threat of violence; to the contrary, it is most often used to mean that an item is no longer available or that someone or something should be removed, ejected, or thrown out.  But it can, in some contexts, mean "to kill."

Because the NPS cited to (or attempted to cite to) the statute making it a crime to threaten the President with physical violence, Dkt. 10-2 at 1 (2d Carey Decl. ¶ 2), the Court starts with true threats.  The Court will also consider incitement, however, which counsel for the government has raised in this litigation.

1.      *True Threats*

"True threats of violence, everyone agrees, lie outside the bounds of the First Amendment's protection."  *Counterman*, 600 U.S. at 72.  "'True threats' encompass those statements where the speaker means to communicate a serious expression of an intent to commit an act of unlawful violence to a particular individual or group of individuals."  *Virginia v. Black*, 538 U.S. 343, 359 (2003).  "The 'true' in that term distinguishes what is at issue from jests, 'hyperbole,' or other statements that when taken in context do not convey a real possibility that violence will follow."  *Counterman*, 600 U.S. at 74 (citing *Watts v. United States*, 394 U.S. 705, 708 (1969) (per curiam)).  "The existence of a threat depends not on 'the mental state of the

9

author,' but on 'what the statement conveys' to the person on the other end." *Id.* (quoting *Elonis v. United States*, 575 U.S. 723, 733 (2015)); *United States v. Syring*, 522 F. Supp. 2d 125, 129 (D.D.C. 2007) ("[c]ourts determining whether communications constitute true threats have generally applied an objective standard . . . [assessing] "whether a reasonable person would consider the statement a serious expression of an intent to inflict harm[.]" (citing *Planned Parenthood of Columbia/Willamette, Inc. v. Am. Coal. of Life Activists*, 290 F.3d 1058, 1075 n.7 (9th Cir. 2002)). Alleged threats "must be analyzed 'in light of their entire factual context,' . . . including: the reaction of the recipient of the threat and of other listeners; whether the threat was conditional; whether the threat was communicated directly to its victim; whether the maker of the threat had made similar statements to the victim in the past; and whether the victim had reason to believe the maker of the threat had a propensity to engage in violence." *Id.* at 130 (citation modified) (quoting *United States v. Dinwiddie*, 76 F.3d 913, 925 (8th Cir. 1996)).

The Supreme Court has clarified, however, that this objective standard does not end the inquiry, at least in a criminal case; "the First Amendment may still demand a subjective mental-state requirement shielding some true threats from liability." *Counterman*, 600 U.S. at 75. In other words, at least in the context of "true-threats cases," *id.* at 73, unless a speaker intends to convey a threat or "consciously disregards a substantial and unjustifiable risk that the conduct will cause harm to another," *id.* at 79 (citation modified), the First Amendment precludes punishing such otherwise unprotected speech, *id.* at 82. Although *Counterman* arose in the context of, and speaks in terms of, criminal prosecutions and criminal punishment, the case has been read by at least some members of the Court to implicate civil enforcement and regulatory action as well. *See id.* at 118–19 (Barrett, J., dissenting) (emphasis in original) (because "this case is about the scope of the First Amendment, not the interpretation of a criminal

10

statute . . . the Court's holding affects the *civil* consequences for true threats just as much as it restricts criminal liability").

Here, although the Secret Service officer read the volunteer her *Miranda* rights, Dkt. 15 at 3, and the Park Police officer subsequently invoked the federal statute criminalizing threats against the President in directing Plaintiff to remove the flag, Dkt. 10-2 at 1 (2d Carey Decl. ¶ 2), Plaintiff does not seek to enjoin an ongoing criminal prosecution or proceeding. Instead, Plaintiff challenges the NPS's direction to remove the flag and the NPS's threatened revocation of Plaintiff's demonstration permit, should the flag reappear. Dkt. 10-3 at 1. Plaintiff, in other words, challenges an administrative action taken by the NPS requiring that Plaintiff remove the flag as a condition of maintaining its NPS-issued demonstration permit, although the basis for the administrative action (as conveyed to Plaintiff by the NPS) was that a federal statute—18 U.S.C. § 871—makes it a crime to "knowingly and willfully . . . make [a] threat against the President." Framed in this manner, it seems likely that the NPS's action can be sustain only if the speech at issue satisfies both the objective and subjective criteria for a true threat. *But see Leroy v. Livingston Manor Cent. Sch. Dist.*, 158 F.4th 414, 423 (2d Cir. 2025) (applying only an objective standard of true threats to student speech that resulted in suspension and ban from school activities). But because the parties have not briefed the issue, and because the NPS, in any event, offers no plausible basis to conclude that a reasonable person, aware of the relevant circumstances, would regard the flag to represent "a serious expression of an intent to commit an act of unlawful violence to" the President, *Black*, 538 U.S. at 559, the Court need not consider whether and how the subjective standard applies to civil proceedings.

The Court starts with the premise that the word "86" is a slang term with no single meaning. According to Merriam-Webster, "Eighty-six is slang meaning 'to throw out,' 'to get

11

rid of,' or 'to refuse service to.'" *What does "eighty-six" mean?*, Merriam-Webster, https://perma.cc/3KZD-9LXL. The phrase "comes from 1930s soda-counter slang meaning that an item was sold out[,]" and may have been used because it rhymes with "nix." *Id.* It was first used as a noun to refer "to an item . . . that had been sold out," but by the 1950s, the term was used as a verb, at first meaning "'to refuse to serve a customer,' . . . later meaning "'to get rid of; to throw out,'" and still later coming to mean "'shut out' or 'rejected.'" *Id.* Merriam-Webster further notes that a recent extension of these meanings has included "'to kill,'" although the dictionary declines to endorse that meaning "due to its relative recency and sparseness of use." *Id.* According to Merriam-Webster, "[t]he most common meaning of *eighty-six* encountered today is the one that is closer to its service industry roots." *Id.*

Plaintiff represents that its display of the flag was "not in any way a threat against the President" but, rather, was part of months-long demonstrations demanding "the impeachment and removal of President Trump." Dkt. 10-2 at 2 (2d Carey Decl. ¶ 6). Although Defendants offer no evidence or explanation regarding how (and why) the NPS understood Plaintiff's actual use of the term, the Deputy Director of the Secret Service attests that he generally "regard[s] the statement '86-47' as a potential call for acts of violence directed at the President of the United States" and that he "understand[s] '86' to represent a euphemism for acts of physical violence." Dkt. 13-1 at 3 (Quinn Decl. ¶ 8). As explained below, the parties' characterizations of the speech are less far apart than they might at first seem: Plaintiff represents that it did not intend to convey a threat of violence and that no reasonable observer would conclude otherwise, while Defendants posit that "86" can at times mean "to kill," although they concede that that is not the only meaning of the term. Although the Court recognizes the importance and difficulty of the mission of the Secret Service, the First Amendment does not permit the government to censor

12

political speech, which no reasonable observer would view, in context, as actually conveying a threat of violence, merely because the speaker uses a phrase that, in addition to other more common meanings, has been used to refer to an act of violence.

The question whether "8647" constitutes a true threat cannot be resolved in the abstract, without consideration of context, and, here, the relevant context makes clear that no reasonable observer could have viewed Plaintiff's display of the flag as a threat to the President's life or physical safety. To start, the flag itself contains no symbols of violence; it is red, white, and blue, and is simply adorned with white stars. It contains no knives, skulls, nooses, or other threatening symbols. Even more to the point, the flag was displayed outside the courthouse, as part of an ongoing demonstration seeking President Trump's impeachment and removal from office. Dkt. 10-2 at 2 (2d Carey Decl. ¶ 6). In a video submitted by Plaintiff, the flag can be seen hanging from one side of Plaintiff's tent, surrounded by not one, but four signs that read "IMPEACH. CONVICT. REMOVE." Dkt. 19. Yet another sign merely reads: "IMPEACH." *Id.* In short, the surrounding signage urged Congress "to throw out" the President.

Nor is there any evidence that Plaintiff or the volunteers who staffed the demonstration engaged in any threatening speech or conduct. To the contrary, when approach by the Secret Service on May 12, the volunteer was cooperative and friendly. Even more importantly, when the officer informed the volunteer that the Secret Service had "received a phone call because of the flag . . . and what it can stand for," the volunteer seemed genuinely stunned and responded: "I never heard of it standing for anything other than Trump shouldn't be in office." Dkt. 15 at 2. When the officer continued, "[s]o you have no ill-will towards" the President, the volunteer said, "I want Trump to live forever," adding that she also wanted him to "rot in jail." *Id.* Given this response, the officer left without taking any further action and, instead, reassured the volunteer

13

that he wanted "to make sure that [her] First Amendment rights are protected" and that "there's no ill-will." *Id.*

Under these circumstances, it is difficult to fathom how the NPS (or the Secret Service) could have concluded that a reasonable observer would view the flag as a true threat. The term "86" is used far more often to mean "throw out" than "kill," and it appeared at a demonstration that was focused, of all things, on the constitutional impeachment and "removal" of the President. Dkt. 10-2 at 2 (2d Carey Decl. ¶ 6); *see also* Dkt. 19. And, for safe measure, the volunteer informed the Secret Service that the flag merely sought President Trump's removal from office. Dkt. 15 at 2.

At oral argument, Defendants' counsel conceded that (1) the inquiry of whether particular speech is a true threat is context-dependent; (2) there are circumstances in which the term "8647" does not represent a true threat to the President, May 28, 2026 Hrg. Tr. (Rough at 15–16); and (3) the Defendants are "not going to prosecute or go after everybody with an 8647 flag," *id.* (Rough at 19). But when asked, how, then, did Defendants conclude that Plaintiff's specific invocation of "8647" constituted a true threat, *id.* (Rough at 16–18, 20, 21–22, 29), Defendants' counsel retreated, repeatedly asserting that the use of the term in the context of unprecedented and recent assassination attempts against the President constitutes a true threat, *id.* (Rough at 16–17, 22, 27, 29, 40). When asked whether the agency engaged in any *case-specific* fact-finding or undertook any analysis of whether Plaintiff's usage of 8647 *in the context of its ongoing demonstration* violated 18 U.S.C. § 871, Defendants' counsel demurred, noting that he either did not know or that there was nothing in the record before the Court. *Id.* (Rough at 29–30, 34, 36, 38).

Given the centrality of this type of context-specific inquiry, and the absence of any evidence that the NPS ever considered the context in which the flag was displayed, the Court invited Defendants to supplement the record with any evidence or material explaining the NPS's thinking. *Id.* (Rough at 38, 43). Defendants failed to offer any analysis or consideration of specific context surrounding Plaintiff's display of the flag. Instead, Defendants simply repeated Deputy Director of the Secret Service Matthew Quinn's averment that he regards "the statement '86-47' as a potential call for acts of violence directed at the President," Dkt. 16 at 1 (citation modified) (quoting Dkt. 13-1 at 3 (Quinn Decl. ¶ 8)), and noted that "a shooting occurred in the vicinity of the White House" on May 24, 2026, and that this "potential assassination attempt" was a "significant intervening event from when [the Secret Service] first encountered the individual holding [the] flag," *id.* (citation modified); that "the Secret Service shared information with the U.S. Department of the Interior about its ongoing investigation relating to the individual holding [the] flag," *id.* at 1–2 (citation modified); that the Secret Service has investigated or is currently investigating "over 1,300 instances of individuals using '86-47'" as a threat, *id.* at 2; that "[m]ost '86-47' investigations by the Secret Service involve online threats" and that the use of the "flag near the White House is a novel event[,]" *id.*; and, finally, that "[t]he Secret Service does not construe '86-47' to mean impeachment[,]" *id.*

Strikingly, only two or three of these assertions have any plausible nexus to the specific context of Plaintiff's display of the flag, and none of those assertions amounts to anything. The first relevant assertion merely notes that the Secret Service is conducting an ongoing investigation of the volunteer who spoke with the officers on May 12. Dkt. 16 at 1–2. But the government says nothing about whether that investigation has revealed any evidence to support a true threat claim, and an investigation is just an investigation. The second and third assertions

merely note that Plaintiff was displaying the flag in the same city in which the White House is located—albeit almost two miles away—and that a shooting occurred on the street near the White House on May 24. *Id.* It sweeps far too broadly, however, to suggest that anyone displaying an "8647" flag in Washington, D.C. after the May 24 shooting has made a true threat to the President's life or safety. The Court does not doubt that political violence is on the rise and that it poses a grave threat not just to the targets of the threats but to the country as a whole. But the enormity of that problem does not change the meaning of Plaintiff's speech, which by any reasonable measure merely advocated for the President's impeachment and removal from office—that is, "to throw [him] out." *What does "eighty-six" mean?*, Merriam-Webster, https://perma.cc/3KZD-9LXL.

Finally, the Court notes that Defendants have yet to ascribe any conclusions to the NPS, which is the agency that directed Plaintiff to remove (that is, to 86) the flag and that admonished the association that the flag's reappearance would constitute a violation of Plaintiff's demonstration permit. Dkt. 10-2 at 1 (2d Carey Decl. ¶ 2). It is possible that the NPS decided to defer to the views of the Secret Service, Dkt. 16 at 1–2, that it conducted its own inquiry, or that it was simply told to see to it that the flag was removed. The record, however, offers no explanation for why the agency acted, other than its mis-citation to 18 U.S.C. § 871, Dkt. 10-2 at 1 (2d Carey Decl. ¶ 2). Absent some explanation of the NPS's actual reasoning—including an assessment of the context surrounding Plaintiff's display of the flag—the Court can only guess as to why the agency decided to censor Plaintiff's speech.

In short, the record contains compelling evidence supporting Plaintiff's contention that it displayed the flag merely to urge President Trump's removal from office but contains no

16

evidence supporting Defendants' contention that the flag represented a true threat on the life or physical well-being of the President of the United States.

> 2.    *Incitement*

In a single paragraph in their brief in response to Plaintiff's TRO motion, Defendants contend that displaying the "8647" flag constitutes incitement and, as a result, is unprotected by the First Amendment.  Dkt. 13 at 2.  Notably, the NPS's direction that Plaintiff remove the flag was premised on 18 U.S.C. § 871 alone, and not on a theory of criminal incitement, and Defendants offer no reason to believe that the NPS premised its decision on a theory of incitement.  As Defendants' counsel conceded at oral argument, May 28, 2026 Hrg. Tr. (Rough at 28–29), there is reason to doubt that the agency can defend its action based on a theory that appeared first in litigation.  *Cf. Grace v. Barr*, 965 F.3d 883, 903 (D.C. Cir. 2020) ("assessing the reasonableness of an agency's action, we look only to what the agency said at the time of the action—not to its lawyers' post-hoc rationalizations." (citation modified)).

But, even if the Court were to reach this alternative theory, it would fare no better (and, if anything, worse) than Defendants' true-threat theory.  Although words of "incitement" are unprotected by the First Amendment, this category of speech is narrowly defined to include words that are "directed [at] producing *imminent* lawless action *and* [that are] likely to incite or produce such action." *Brandenburg v. Ohio*, 395 U.S. 444, 447 (1969) (per curiam) (emphasis added).  Like true threats, "incitement inheres in particular words used in particular contexts[.]" *Counterman*, 600 U.S. at 76.  But incitement "demand[s] more" than even true threats: it requires the speaker to have "specific intent, presumably equivalent to purpose or knowledge." *Id.* at 81.

For many of the reasons already discussed, the evidence shows that Plaintiff displayed the 8647 flag to urge that Congress impeach and remove President Trump from office.  Dkt. 15 at 2; Dkt. 10-2 at 2 (2d Carey Decl. ¶ 6).  The record contains no evidence that a reasonable

17

observer would have viewed the flag as an incitement to imminent violence or that Plaintiff intended to incite political violence.  Dkt. 15 at 2.  Although Deputy Director Quinn attests that he believes that the term 8647 "as it is understood today, *can* incite violence by others," Dkt. 13-1 at 3 (Quinn Decl. ¶ 8) (emphasis added), *Brandenburg* does not refer to words that "can incite" imminent lawlessness—it refers to words that are "likely to incite," 395 U.S. at 447—and Defendants do not even suggest that Plaintiff's flag comes close to satisfying that demanding standard.  Indeed, the Secret Service knew about Plaintiff's flag, *see generally* Dkt. 15, yet permitted Plaintiff to continue to display it for more than two weeks, Dkt. 10-2 at 1–2 (2d Carey Decl. ¶¶ 2, 4), which the agency undoubtedly would never have allowed if it believed that the flag was "likely" to incite an imminent attack on the President or any imminent violence at all.

The Court, accordingly, concludes that Plaintiff is likely to succeed on the merits of its challenge to the NPS's direction that it remove the flag or face revocation of the existing permit.

**B.      Irreparable Injury**

Perhaps for good reason, Defendants do not even address this factor.  The law is well-settled that "[t]he loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury." *Pursuing Am.'s Greatness v. Fed. Election Comm'n*, 831 F.3d 500, 511 (D.C. Cir. 2016) (citation modified).  The NPS directed Plaintiff to remove its flag—that is, to refrain from engaging in protected expression—and informed Plaintiff that if the flag reappears, the agency would view such conduct as a violation of Plaintiff's demonstration permit.  Dkt. 10-2 at 1 (2d Carey Decl. ¶ 2).  The government has appeared at Plaintiff's demonstration on multiple occasions, *id.*; Dkt. 15, and has made clear on at least one of those occasions that, in the government's view, displaying the flag constitutes a criminal offense, Dkt. 10-2 at 1 (2d Carey Decl. ¶ 2).  Without preliminary relief, Plaintiff cannot

display the flag without fear of retribution, and will likely suffer an ongoing and irreparable deprivation of its First Amendment rights.[2]

## C.      Balance of Equities and Public Interest

The balance-of-equities and public-interest factors merge if "the [g]overnment is the opposing party[.]"  *Karem v. Trump*, 960 F.3d 656, 668 (D.C. Cir. 2020) (quoting *Nken v. Holder*, 556 U.S. 418, 435 (2009)).  That is, "the [Defendants'] harm and the public interest are one and the same, because the government's interest *is* the public interest."  *Pursuing Am.'s Greatness*, 831 F.3d at 511 (emphasis in original).  Here, these factors also favor Plaintiff.

As the D.C. Circuit has frequently observed, there is "generally no public interest in the perpetuation of unlawful agency action," *League of Women Voters of United States v. Newby*, 838 F.3d 1, 12 (D.C. Cir. 2016) (collecting cases), and that principle applies with particular force when the government engages in content-based censorship of political speech.  To be sure, a true threat to the life or safety of the President would undoubtedly outweigh the interest of the public or the speaker in continuing to urge that unlawful conduct.  But, for the reasons explained above, that is not this case.  The government seeks to squelch core political speech without any articulable—much less evidentiary—basis for concluding that the speech actually threatens the life or safety of the President.  On the current record, Defendants have offered no basis to doubt that Plaintiff is engaged in fully protected First Amendment activity, and it is a bridge too far to suggest that the "important issue of safety for the President of the United States," Dkt. 13 at 4,

---

[2]  It is no answer, moreover, to posit that Plaintiff could always re-display the flag and then challenge the NPS's revocation of its permit.  A plaintiff should not be required to endure a violation of its First Amendment rights—that is, revocation of an otherwise valid permit to demonstrate—to obtain judicial review of another violation of its First Amendment rights—that is, a restriction on what the plaintiff may say at that demonstration.

provides a permissible basis even briefly to suppress political speech based on nothing more than the unsubstantiated possibility that it might unreasonably be misunderstood as a call to violence.

Notably, by granting Plaintiff's motion for a TRO, the Court is not precluding the government from responding to other speech that constitutes a true threat or an incitement to lawlessness. Those are demanding doctrines, however, and for good reason—they protect core First Amendment values that are essential to liberty and democracy. An agency's mere say so— a conclusory assertion that it "regards" that flag "as a potential call for acts of violence," Dkt. 16 at 1 (citation modified), without consideration of specific context and without sound reason to conclude that a reasonable person would, in fact, understand that message as a true threat—is not close to enough. Under these circumstances, "the public's interest in protecting First Amendment rights and [Plaintiff's] ability to exercise those rights outweigh any interest in the continued enforcement." *Pursuing Am.'s Greatness*, 831 F.3d at 512.

\* \* \*

Because all four factors weigh decisively in Plaintiff's favor, the Court will grant Plaintiff's motion for a temporary restraining order.

## CONCLUSION

For the foregoing reasons, Plaintiff's application for a temporary restraining order, Dkt. 10, is hereby **GRANTED**. It is further **ORDERED** that:

Defendants, their agents and employees, and all persons acting in concert with them, are hereby **RESTRAINED**, for 14 days from the date of this Order, from revoking Plaintiff's demonstration permit as a result of Plaintiff's display of its "8647" flag, or otherwise ordering the removal of or seizing Plaintiff's "8647" flag.

20

It is further **ORDERED** that this order shall be effective upon the posting of a bond in the amount of $1.00 with the Clerk of the Court.

A separate order will follow.

/s/ Randolph D. Moss
RANDOLPH D. MOSS
United States District Judge

Date:  June 1, 2026