**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| ACCOUNTABILITY NOW USA, | |
| *Plaintiff*, | |
| *v.* | Civil Action No. 26-1385 (RDM) |
| KEVIN GRIESS, *Superintendent of the National Mall and Memorial Parks*, *et al.*, | |
| *Defendants*. | |

**DEFENDANTS' MEMORANDUM IN OPPOSITION TO PLAINTIFF'S
RENEWED MOTION FOR PRELIMINARY INJUNCTION**

**TABLE OF CONTENTS**

Preliminary Statement.................................................................................................... 1

Background ..................................................................................................................... 2

      A.  Statutory and Regulatory Background........................................................ 2

      B.  Factual Background ................................................................................... 4

      C.  Procedural Background.............................................................................. 8

Legal Standard .............................................................................................................. 9

Argument ...................................................................................................................... 9

I.       Accountability NOW is unlikely to succeed on the merits............................... 9

      A.  The request that Accountability NOW take down its child-rape signs
      directed at "KIDS" does not violate the First Amendment.............................. 10

          1.  *Ginsberg*'s obscene-for-minors standard applies because
          Accountability NOW's signs were directed at children...............................11

          2.  Accountability NOW's signs are obscene-for-minors under *Ginsberg*. .............. 13

          3.  NPS's request satisfies rational-basis review....................................... 18

          4.  Alternatively, NPS's request survives intermediate or strict scrutiny.................. 19

      B.  The request that Accountability NOW take down its "86-47" flag
      does not violate the First Amendment. ............................................................ 22

II.     Accountability NOW will not suffer irreparable harm in the absence
      of a preliminary injunction.............................................................................. 25

III.    The balance of the equities and the public interest favor Defendants. ............................ 26

IV.    Accountability NOW's requested relief is overbroad....................................... 27

Conclusion ................................................................................................................... 28

# TABLE OF AUTHORITIES

## Cases

*Boy Scouts of America v. Dale,*
530 U.S. 640 (2000) ................................................................................................... 19

*Brockett v. Spokane Arcades, Inc.,*
472 U.S. 491 (1985) ............................................................................................. 13, 14

*Burson v. Freeman,*
504 U.S. 191 (1992) ..................................................................................................... 22

*Butt v. State,*
398 P.3d 1024 (Utah 2017) ......................................................................................... 15

*Chaplinsky v. New Hampshire,*
315 U.S. 568 (1942) ..................................................................................................... 10

*Cohen v. California,*
403 U.S. 15 (1971) ........................................................................................... 14, 16, 17

*Commonwealth v. Holmes,*
17 Mass. 336 (1821) ..................................................................................................... 19

*Commonwealth v. Sharpless,*
2 Serg. & Rawle 91 (Pa. 1815) .................................................................................... 19

*District of Columbia v. Heller,*
554 U.S. 570 (2008) ...................................................................................................... 11

*Erznoznik v. City of Jacksonville,*
422 U.S. 205 (1975) ......................................................................................... 13, 14, 15

*FCC v. Beach Commc'ns, Inc.,*
508 U.S. 307 (1993) ..................................................................................................... 18

*\*Free Speech Coal., Inc. v. Paxton,*
606 U.S. 461 (2025) ................................................... 10, 11, 13, 16, 18, 19, 20, 21, 23

*\*Ginsberg v. New York,*
390 U.S. 629 (1968) ................................................... 11, 12, 13, 16, 18, 21

*Hoover v. Byrd,*
801 F.2d 740 (5th Cir. 1986) ...................................................................................... 16

*Karem v. Trump,*
960 F.3d 656 (D.C. Cir. 2020) .................................................................................... 26

*Kois v. Wisconsin*,
  408 U.S. 229 (1972)......................................................................................... 17

*Lujan v. Defenders of Wildlife*,
  504 U.S. 555 (1992)......................................................................................... 28

*Mazurek v. Armstrong*,
  520 U.S. 968 (1997)........................................................................................... 9

*McDonald v. City of Chicago*,
  561 U.S. 742 (2010)......................................................................................... 10

*Memoirs v. Massachusetts*,
  383 U.S. 413 (1966)......................................................................................... 17

*\*Miller v. California*,
  413 U.S. 15 (1973)............................................................... 13, 15, 16, 17, 18

*New York v. Ferber*,
  458 U.S. 747 (1982)......................................................................................... 21

*Nken v. Holder*,
  556 U.S. 418 (2009)...................................................................................... 9, 26

*Pope v. Illinois*,
  481 U.S. 497 (1987)......................................................................................... 17

*Pursuing Am.'s Greatness v. Fed. Election Comm'n*,
  831 F.3d 500 (D.C. Cir. 2016) ...................................................................... 25

*Regina v. Hicklin*,
  L.R. 3 Q.B. 360 (1868) ................................................................................... 12

*Roth v. United States*,
  354 U.S. 476 (1957)...................................................................... 11, 12, 13, 14

*Sable Commc'ns of Calif., Inc. v. FCC*,
  492 U.S. 115 (1989)......................................................................................... 21

*Spokeo, Inc. v. Robins*,
  578 U.S. 330 (2016)......................................................................................... 28

*Starbucks Corp. v. McKinney*,
  602 U.S. 339 (2024)........................................................................................... 9

*TikTok v. Garland*,
  604 U.S. 56 (2025)........................................................................................... 20

iii

*Turner Broadcasting System, Inc. v. FCC*,
  520 U.S. 180 (1997) ................................................................................................. 20

*United States v. Comey*,
  No. 4:26-cr-00016 (E.D.N.C. Apr. 28, 2026) ............................................................ 6

*United States v. Guglielmi*,
  819 F.2d 451 (4th Cir. 1987),
  *cert. denied* 484 U.S. 1019 (1988) ........................................................................... 14

*United States v. Pryba*,
  900 F.2d 748 (4th Cir. 1990) ..................................................................................... 16

*United States v. Stevens*,
  559 U.S. 460 (2010) ................................................................................................... 10

*Ward v. Rock Against Racism*,
  491 U.S. 781 (1989) ................................................................................................... 20

*Watts v. United States*,
  394 U.S. 705 (1969) ................................................................................................... 23

*Williams-Yulee v. Fla. Bar*,
  575 U.S. 433 (2015) ................................................................................................... 22

*Winter v. Nat. Res. Def. Council, Inc.*,
  555 U.S. 7 (2008) ......................................................................................................... 9

## Statutes

18 U.S.C. § 871 ................................................................................................................ 3, 6, 8

18 U.S.C. § 875(c) ................................................................................................................... 6

54 U.S.C. § 100101(a) ........................................................................................................ 2, 20

D.C. Code § 22-1321 ............................................................................................................... 3

D.C. Code § 22-2201 ............................................................................................................... 3

D.C. Code § 5-201 ................................................................................................................... 3

## Regulations

36 C.F.R. § 2.34(a)(2) ............................................................................................................. 3

36 C.F.R. § 7.96(g)(1)(i) ......................................................................................................... 2

36 C.F.R. § 7.96(g)(1)(vii) ................................................................................................ 3

36 C.F.R. § 7.96(g)(2)(ii) ................................................................................................. 2

36 C.F.R. § 7.96(g)(4)(vii)(B) ......................................................................................... 3

36 C.F.R. § 7.96(g)(6) .................................................................................................. 2, 4

## Other Authorities

A. D. Richer & E. Tucker, *Ex-FBI Director Comey indicted again,*
*in a probe over an online post officials call a Trump threat*, AP (Apr. 28, 2026) ................ 6, 24

*About FLARE*, FLARE USA ............................................................................................... 5

H. Rabinowitz, K. Holmes, H. Lybrand, & T. Sneed, *Exclusive:*
*Former FBI Director James Comey indicted over alleged*
*'threat' against Trump*, CNN (updated Apr. 29, 2026, 8:01 AM) ................................................. 6

H.R. Rep. No. 652, 64th Cong., 1st Sess. (1916) .......................................................... 23

K. Epstein & M. Halpert, *Comey surrenders over charge of*
*threatening Trump's life in Instagram post*, BBC (Apr. 29, 2026) ............................................. 6

K. L. Griess, *Nat'l Mall and Mem. Parks*
*Superintendent's Compendium*, NPS (June 8, 2026) ................................................................... 3

Oxford English Dictionary (2d ed.) (1978) ...................................................................... 16

Press Release, *Five men arrested & charged in plot to attack &*
*kill government officials, others attending Ultimate Fighting Championship*
*at White House*, U.S. DEP'T OF JUST. (June 16, 2026) ............................................................. 23

*Suspect killed after firing shots near White House security checkpoint,*
*Secret Service says*, PBS (May 24, 2026 11:33 AM) ................................................................. 7

T. Emerson, *Toward a General Theory of the First Amendment,*
72 YALE L.J. 877 (1963) ................................................................................................... 11

Webster's Third Int'l Dictionary (1971) ......................................................................... 16

## PRELIMINARY STATEMENT

Accountability NOW asks this Court to grant extraordinary relief so that it can display signs directed at "KIDS" telling them that some "PARENTS" "LOVE CHILD RAPISTS" and that the President of the United States "RAPES LITTLE GIRLS." Setting aside their utter lack of truth and redeeming value, these signs are obscene for minors and directed at children, so the First Amendment does not protect them. But even if they are not categorically unprotected, the National Park Service furthered a compelling governmental interest by asking Accountability NOW to take down just these two obscene signs.

Accountability NOW also asks this Court to allow it to promote "86-47" messages during a time of extraordinary political violence. The phrase "86-47" urges violence against President Donald J. Trump, who has now been the target of numerous publicly reported assassination attempts. The context of Accountability NOW's demonstration—which once called for a "PARTY … WHEN HE'S DEAD," Ex. A (Sheffer Decl.) at 6—confirms that the message is both threatening and inciteful, so the First Amendment does not protect it. But even if it is not categorically unprotected, NPS had a compelling interest in removing this message and did so in a narrow manner. Importantly, NPS removed only the threatening "86-47" flag and not any signs that actually call for "impeachment and removal." Restoring these child-rape signs and "86-47" flag is not an emergency, and the public interest in safety from political violence and obscenity directed at minors outweighs whatever harm Accountability NOW says it might suffer if it cannot urgently display them.

The public interest against a preliminary injunction is especially great for two reasons. First, our Nation's 250th anniversary is bringing visitors of all ages to the District of Columbia for a number of family-friendly events, including the Great American State Fair. The public has an interest in protecting local and visiting "KIDS" from obscene messages about their parents and

1

child rape. Second, given the recent attempts at the President's life, the U.S. Secret Service has concluded that today's threat environment is "heightened, real, and dynamic." Dkt. No. 13-1 (Quinn Decl.) at ¶ 7. According to our Nation's security experts, "86-47" messages contribute to this environment. *See id.* ¶ 8–9. The Court should not allow Accountability NOW to instigate further hostility by displaying a message that encourages political violence.

To this day, Accountability NOW may demonstrate peaceably. It still has a demonstration permit and, in fact, has received several amended permits since NPS first asked it to take the obscene signs down on April 12. And it continues to freely display messages criticizing the President. Accordingly, whether the Court finds that the obscene and threatening speech here is categorically unprotected or that Defendants acted in a narrowly tailored manner that furthers a compelling interest, the Court should deny the request for a preliminary injunction.

## BACKGROUND

### A.    Statutory and Regulatory Background

The National Park Service (NPS) is a federal agency within the U.S. Department of the Interior (DOI) charged with "conserv[ing]" and "provid[ing] for the enjoyment of the scenery, natural and historic objects, and wild life" on National Park System land such that its resources are left "unimpaired for the enjoyment of future generations." 54 U.S.C. § 100101(a). Under NPS regulations, demonstrations in relevant portions of the National Capital Region involving more than twenty-five people may be held pursuant to a permit, subject to certain restrictions, including that any permittee must comply with all applicable laws. 36 C.F.R. § 7.96(g)(2)(ii), (g)(6).[1]

---

[1] The term "demonstration" includes "picketing, speechmaking, marching, holding vigils or religious services and all other like forms of conduct that involve the communication or expression of views or grievances, engaged in by one or more persons, the conduct of which is reasonably likely to draw a crowd or onlookers." 36 C.F.R. § 7.96(g)(1)(i).

NPS regulations are one source of applicable laws. As relevant here, they prohibit disorderly conduct, which occurs when someone intentionally "uses language, an utterance, or gesture, or engages in a display or act that is obscene, physically threatening or menacing, or done in a manner that is likely to inflict injury or incite an immediate breach of the peace." *Id.* § 2.34(a)(2).

Federal law also applies on National Park System land. 18 U.S.C. § 871 prohibits "[t]hreats against [the] President and successors to the Presidency." In particular, 18 U.S.C. § 871(a) prohibits "knowingly and willfully" making a "threat to take the life of, to kidnap, or to inflict bodily harm upon the President."

D.C. laws also generally apply on National Park System land in the District of Columbia. D.C. Code § 5-201 authorizes U.S. Park Police (USPP) to "have and perform the same powers and duties as the Metropolitan Police of the District," and the National Mall Superintendent's Compendium expressly recognizes that USPP officers enforce D.C. law within the park pursuant to D.C. Code § 5-201. K. L. Griess, *Nat'l Mall and Mem. Parks Superintendent's Compendium*, NPS (June 8, 2026).[2] Examples of applicable D.C. laws include D.C. Code § 22-1321 (prohibiting disorderly conduct) and § 22-2201 (prohibiting certain obscene activities).

The Regional Director of NPS's National Capital Region or her designee reviews applications and may deny a permit where it "reasonably appears that the proposed demonstration or special event will present a clear and present danger to the public safety, good order, or health." 36 C.F.R. § 7.96(g)(4)(vii)(B); *see also id.* § 7.96(g)(1)(vii) (defining the term "Regional Director" to include "an authorized representative thereof"). And permits are subject to revocation "upon a

---

[2] Available at https://www.nps.gov/nama/learn/management/superintendent-s-compendium.htm [https://perma.cc/5755-TQ5N].

ground for which an application … would be subject to denial." *Id.* § 7.96(g)(6). "During the conduct of a demonstration, a permit may be revoked by the ranking U.S. Park Police supervisory official in charge if continuation of the event presents a clear and present danger to the public safety, good order or health or for any violation of applicable law or regulation." *Id.*

## B.    Factual Background

Accountability NOW has been staging a permitted demonstration at a site near the General Meade statue on the 300 block of Constitution Avenue, Northwest, since December 12, 2025. Amended Compl. ¶ 7. Sometime on or after February 24, 2026, it began displaying two new signs at its demonstration that read "KIDS, IF YOUR PARENTS ARE MAGA, THEY LOVE CHILD RAPISTS" and "TRUMP RAPED LITTLE GIRLS." *Id.* at ¶ 9; Sheffer Decl. at 4–5, 7.

On March 18, 2026, with its permit due to expire the next month, Accountability NOW submitted a new application to NPS for its extension.[3] The application indicated that the demonstration would occur every day during its proposed term, would have a maximum of 3,260 attendees, and would continue to be held on the aforementioned site. The application stated that daily activities under the permit would consist of "providing literature to passersby and asking for support for the impeachment of the President" and "providing educational information on the First Amendment and holding the government accountable for its actions."

NPS issued a permit to Accountability NOW under a term beginning on April 13, 2026, and ending on August 12, 2026.[4] The permit provided that, under its terms, Accountability NOW

---

[3] Permit applications and permits include personal information to include phone numbers, addresses, etc., so Defendants do not attach them as exhibits to this filing. Defendants are prepared to provide Accountability NOW's permit application, permit, and amended permits to the Court under seal or otherwise upon request.

[4] On April 16, 2026, NPS issued an amended permit to Plaintiff correcting a typo on page two. On June 11, 2026, NPS issued a second amended permit reflecting a change in Accountability

4

will conduct a "daily vigil" at the authorized site "to show solidarity for other Americans exercising their freedom of speech."  It further noted that "[t]he primary activity will be tabling (distributing leaflets) to show solidarity with Americans calling for accountability in the government" and authorized the demonstration to have up to five signs and two sandwich boards.

On April 14, 2026, Defendant Dr. Kevin Griess, through another NPS employee, relayed the NPS's position that the signs appeared to contain obscenity.  Amended Compl. ¶ 10.  That same day, Accountability NOW emailed Dr. Griess "seeking clarification of NPS's position and … what would happen if the signs remained on display." *Id.* ¶ 11.  On April 15, 2026, Dr. Griess responded, expressing his appreciation for Accountability NOW's cooperation, "ask[ing] that the [two signs] be removed" on the basis of obscenity, and noting that "[a]ll activities conducted under an NPS permit must remain lawful and in compliance with permit conditions" and that, in the event of noncompliance, NPS "may take further steps as appropriate to ensure compliance." *Id.* ¶ 12. Accountability NOW, in response, temporarily removed the signs while otherwise maintaining its demonstration and other displays that were not obscene and directed at children. *Id.* at ¶ 21.

On April 14, 2026, an NPS permitting official took photographs of Accountability NOW's demonstration during a compliance check.  *See generally* Sheffer Decl.  Along with the signs about child rape, one of the signs read "PARTY AT FLARE WHEN HE'S DEAD." *Id.* at 6.[5]

---

NOW's onsite contacts.  For the reason discussed in footnote 3, Defendants do not attach any permits here.

[5] Defendants understand that Accountability NOW and "FLARE" are related entities.  FLARE's website, https://flareusa.org, prominently features a map of the Accountability NOW demonstration site on its landing page.  It also explains that "FLARE hosts recurring demonstrations at Nazi* hotspots around D.C.," hosts "'Kidzapalooza' resistance parties," says it will accomplish its goals through "participating in direct action initiatives," and encourages its "Resisters" to "take precautions before protesting off-site" to include "utilizing disguises." *About FLARE*, FLARE USA (accessed June 16, 2026), https://flareusa.org/about-flare [https://perma.cc/QE6Z-97D8].

On April 28, 2026, media reported that a grand jury in the Eastern District of North Carolina charged former Federal Bureau of Investigation Director James Comey with sharing a threatening "86-47" message in violation of 18 U.S.C. § 871 (prohibiting threats against the President) and 18 U.S.C. § 875(c) (prohibiting interstate communication of threats). H. Rabinowitz, K. Holmes, H. Lybrand, & T. Sneed, *Exclusive: Former FBI Director James Comey indicted over alleged 'threat' against Trump*, CNN (updated Apr. 29, 2026, 8:01 AM);[6] *See* Indictment at 1–2, *United States v. Comey*, No. 4:26-cr-00016 (E.D.N.C. Apr. 28, 2026), ECF No. 1. Coverage of this indictment was widespread, broadcasting that, among other things, "86" can mean to kill or to "encourage violence against [President] Trump." K. Epstein & M. Halpert, *Comey surrenders over charge of threatening Trump's life in Instagram post*, BBC (Apr. 29, 2026);[7] *accord, e.g.*, A. D. Richer & E. Tucker, *Ex-FBI Director Comey indicted again, in a probe over an online post officials call a Trump threat*, AP (Apr. 28, 2026) (reporting that "folks associate" "86-47" with political violence).[8]

Just after widespread reporting that "86-47" may encourage political violence against the President, Accountability NOW began displaying a flag with an "86-47" message. *See* Dkt. No. 10-2 (Second Carey Decl.) at ¶ 4 (explaining on May 27, 2026, that Accountability NOW had been displaying its "86-47" flag for "more than two weeks"). Accountability NOW had other displays at its demonstration site, including "impeach, convict, and remove" messages and a balloon appearing to depict a green figure sexually assaulting the President. Dkt. No. 19 (Pl.'s

---

[6] Available at https://www.cnn.com/2026/04/28/politics/justice-department-indicts-ex-fbi-director-james-comey-again [https://perma.cc/W7U5-8N9W].

[7] Available at https://www.bbc.com/news/articles/c70vzj1nrddo [https://perma.cc/4QZU-3C39].

[8] Available at https://apnews.com/article/comey-indicted-seashell-photo-86-47-a7fdd67891a7f74bc6fd8ce4d3d4170a [https://perma.cc/MQQ8-N9TU].

Photographic Filing) at 0:08–0:21 (depicting the "86-47" flag and surrounding context on May 14, 2026).[9]

On May 12, 2026, a U.S. Secret Service officer interviewed an individual near Accountability NOW's demonstration to investigate a report about an "86-47" flag. Dkt. No. 16 (Defs.' Suppl. Filing in response to Pl.'s TRO App.) at 1–2; *see* Dkt. No. 15 (Pl.'s Suppl. Filing on TRO Motion) at 1–3. Despite widespread reporting about "86-47," an Accountability NOW volunteer told the Secret Service agent that the volunteer has never heard of the term "86" "standing for anything other than Trump shouldn't be in office." *Id.* at 2. At the end of the visit, the Secret Service officer reassured the volunteer that "[w]e just want to make sure that your First Amendment rights are protected" and that "we just want to make sure there's no ill-will." *Id.*

Later that day, two other Secret Service officers visited Accountability NOW's site. *Id.* at 1, 3. After telling an Accountability NOW volunteer that the encounter was consensual, the volunteer declined to speak with the officers, ending the encounter. *Id.* In connection with this "86-47" flag, the Secret Service "opened an investigation into the potential threat." Dkt. No. 13-1 (Quinn Decl.) at ¶ 10.

About two weeks later, on May 24, 2026, a gunman opened fire within yards of the White House Complex. *Id.* at ¶ 7. This was the "third incidence of gunfire in the vicinity of President Donald Trump in the [preceding] month." *Suspect killed after firing shots near White House security checkpoint, Secret Service says*, PBS (May 24, 2026 11:33 AM).[10]

---

[9] A link to the video is available at https://photos.app.goo.gl/sgb28v6FSz6jLEQbA [https://perma.cc/XT8C-NPXP].

[10] Available at https://www.pbs.org/newshour/nation/suspect-killed-after-firing-shots-near-white-house-security-checkpoint-secret-service-says [https://perma.cc/ZQ2M-GBXN].

The business day following the shooting at the White House, the Secret Service shared with DOI information "about its ongoing investigation relating to the 'individual holding a flag displaying the statement "86-47"' on May 12 in the 300 block of Constitution Avenue, N.W." Dkt. No. 16 (Defs.' Suppl. Filing in response to Pl.'s TRO App.) at 1–2. The Secret Service was not aware that the individual was affiliated with Accountability NOW or that Accountability NOW had recently filed its first motion for a preliminary injunction in this matter. *Id.* At 2.

On May 27, the next day, USPP officers visited Accountability NOW's demonstration site and ordered it to take down its "86-47" flag. Amended Compl. at ¶ 22. In doing so, one of the officers cited "18 U.S.C. § 8741," which the Parties agree intended to refer to "18 U.S.C. § 871." Dkt. No. 27 (Renewed Mot.) at 9 (explaining that "the officer presumably was referring to 18 U.S.C. § 871").

During this litigation, Accountability NOW has introduced new displays, including one with a racoon waving an "86-47" flag and a sign that says "TRUMP ASSAULTS CHILDREN OBVIOUSLY." *Id.* at 24–25.

### C.     Procedural Background

Accountability NOW filed the Complaint in this action on April 23, 2026, Dkt. No. 1, and an Amended Complaint on May 27, 2026, Dkt. No. 9. Accountability NOW characterizes Dr. Griess's communications as a "threat to revoke Plaintiff's demonstration permit and/or remove Plaintiff's signs" and contends that the "revocation of Plaintiff's demonstration permit, or the seizure or destruction of its property … would violate Plaintiff's rights under the First Amendment to the U.S. Constitution." *Id.* ¶¶ 25–26. For relief, Accountability NOW requests, among other things, that the Court declare that the signs reading "KIDS, IF YOUR PARENTS ARE MAGA, THEY LOVE CHILD RAPISTS" and "TRUMP RAPES LITTLE GIRLS" are not obscene and

that their display is protected by the First Amendment and enjoin Defendants from revoking Accountability NOW's permit or seizing or destroying its property. *Id.* at 7–8.

On June 1, 2026, the Court granted Accountability NOW's TRO application, restraining Defendants for 14 days from revoking Accountability NOW's permit as a result of its "86-47" flag or otherwise ordering the removal of or seizing its flag. Dkt. No. 21. The Court extended the TRO for fourteen additional days from June 15, 2026. Dkt. No. 29. Accountability NOW's Renewed Motion for Preliminary Injunction is now before the Court. Dkt. No. 27.

## LEGAL STANDARD

A preliminary injunction is "an extraordinary remedy that may only be awarded upon a clear showing that the plaintiff is entitled to such relief." *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 22 (2008). To obtain a preliminary injunction, the movant "must make a clear showing that 'he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest.'" *Starbucks Corp. v. McKinney*, 602 U.S. 339, 346 (2024) (quoting *Winter*, 555 U.S. at 20, 22); *accord Mazurek v. Armstrong*, 520 U.S. 968, 972 (1997) (per curiam). The third and fourth factors, "harm to the opposing party and weighing the public interest … merge when the Government is the opposing party." *Nken v. Holder*, 556 U.S. 418, 435 (2009) (rejecting the view that the public is "negligible" when juxtaposed against a single person's claim).

## ARGUMENT

I.   ACCOUNTABILITY NOW IS UNLIKELY TO SUCCEED ON THE MERITS.

Accountability NOW cannot succeed on the merits of its First Amendment claim. First, its child-rape signs were explicitly directed at children ("KIDS") and obscene for minors, so the First Amendment does not protect it. But even if these signs directed at "KIDS" about child rape are not categorically unprotected, NPS's request furthered a compelling governmental interest in a

narrowly tailored fashion.    Second, Accountability NOW's "86-47" flag is categorically unprotected.  But even if it is not categorically unprotected, NPS's request to take it down likewise furthered a compelling governmental interest in a narrowly tailored fashion.

### A.    The request that Accountability NOW take down its child-rape signs directed at "KIDS" does not violate the First Amendment.

Because Accountability NOW's two child-rape signs are actually directed at minors—"***KIDS***, IF YOUR PARENTS ARE MAGA, THEY LOVE CHILD RAPISTS"—and obscene to minors—"CHILD RAPISTS" and "RAPES LITTLE GIRLS"—they are not protected speech under the First Amendment.  *See* Sheffer Decl. at 4–5 (photographs of child-rape signs).  Thus, the Court should apply rational-basis review and conclude that Defendants had a rational basis to ask Accountability NOW to remove the signs.  Alternatively, even if intermediate or strict scrutiny applies, Defendants are likely to prevail on the merits because they had a compelling governmental interest in protecting children from explicit messages about child rape and their request was narrowly tailored.

The First Amendment prohibits laws abridging the freedom of speech, but "certain historic and traditional categories of speech—such as obscenity, defamation, fraud, incitement, and speech integral to criminal conduct—have been understood to fall outside the scope of the First Amendment" since the Bill of Rights was ratified.  *Free Speech Coal., Inc. v. Paxton*, 606 U.S. 461, 471 (2025) (quoting *United States v. Stevens*, 559 U.S. 460, 468 (2010)) (internal quotation marks omitted).  Like states, the federal government "may prohibit speech of this kind without 'rais[ing] any Constitutional problem.'"  *Id.* (quoting *Chaplinsky v. New Hampshire*, 315 U.S. 568, 571–72 (1942)); *see McDonald v. City of Chicago*, 561 U.S. 742, 765 (2010) (explaining that the protections in the Bill of Rights apply to the federal government and states "according to the same standards").  When it does, the government's actions are "subject only to rational-basis review, the

10

minimum constitutional standard that all legislation must satisfy." *Free Speech Coal.,* 606 U.S. at 471 (citing *District of Columbia v. Heller*, 554 U.S. 570, 628 n.27 (2008)).

> 1.    Ginsberg*'s obscene-for-minors standard applies because Accountability NOW's signs were directed at children.*

Because the government has a "specific interest in protecting *children* from sexually explicit speech," *Free Speech Coal., Inc. v. Paxton*, 606 U.S. 461, 473 (2025), it may regulate speech that is obscene to minors and directed at them without offending the First Amendment, *Ginsberg v. New York*, 390 U.S. 629, 637–43 (1968).  Defendants' request that Accountability NOW take down its two child-rape signs pertained only to speech directed at minors, so *Ginsberg*'s obscene-for-minors standard applies.

**i.** *Ginsberg*, 390 U.S. 629, applies to the regulation of speech directed at children.  In that case, the Supreme Court upheld a state law that employed "variable concepts of obscenity," prohibiting the sale to minors of speech that is obscene to them regardless of whether that speech is obscene to adults.  *Id.* at 635 n.4.  The Court explained that variable standards are appropriate given that the "well-being of its children is of course a subject within the State's constitutional power to regulate" and that a state legislature "could properly conclude that parents and others, teachers for example, who have [the] primary responsibility for children's well-being are entitled to the support of laws designed to aid in the discharge of that responsibility." *Id.* at 639.  Because "regulations of communication addressed to [children] need not conform to the requirements of the first amendment in the same way as those applicable to adults," *id.* at 638 n.6 (quoting T. Emerson, *Toward a General Theory of the First Amendment*, 72 YALE L.J. 877, 939 (1963)), and the challenged New York law regulated speech to children, *Ginsberg* declined to apply the existing general obscenity standard.  *Id.* at 643 (declining to apply the existing standard under *Roth v. United States*, 354 U.S. 476 (1957)).

11

As with the state in *Ginsberg*, NPS is regulating only obscene speech directed to minors. In *Ginsberg*, the Supreme Court reasoned that the governmental action pertained to minors because the defendant was selling materials that were designed for a general audience to minors. *Id.* at 637. Here, Accountability NOW's child-rape message was specifically designed for minors: One sign had a salutation to "KIDS" with an obscene accusation about their "PARENTS," and the other had a similarly explicit accusation about a public figure. "KIDS" were clearly the message's target audience.[11]    Accountability NOW, despite addressing obscenity for minors, does not even deny that the signs are directed to minors. *See* Renewed Mot. at 14–15. So the standard for messages that are potentially obscene to minors applies.

**ii.** Children—or "KIDS"—were not merely accidental viewers of Accountability NOW's child-rape signs. *Contra* Renewed Mot. at 15 (contending that "the fact that minors may see the signs as they walk along Constitution Avenue does not place them outside the First Amendment's protection"). It is true that incidental viewers from a particularly vulnerable class—like children— do not wield a veto over speech that is suitable for the public at large. *See Roth*, 354 U.S. at 489 (rejecting *Regina v. Hicklin*, L.R. 3 Q.B. 360 (1868), which permitted "material to be judged merely by the effect of an isolated excerpt upon particularly susceptible persons"). But Accountability NOW's speech, on its own terms, was not directed to the public at large—it was directed at and tailored to "KIDS," *i.e.*, minors.

And children cannot be expected to simply "'avoid further bombardment of [their] sensibilities simply by averting [their] eyes'" away from the signs calling for their direct attention. *Contra* Renewed Mot. at 14 (quoting *Erznoznik v. City of Jacksonville*, 422 U.S. 205, 210–11

---

[11] The Oxford English Dictionary primarily defines "kid" as "[a] child, esp. a young child," when used as slang. 5 Oxford English Dictionary 689 (2d ed.) (1978).

(1975)).  Once any child saw the signs—in their large, bold, capitalized typeface calling for the attention of "KIDS"—the damage had already been done.

>    2.    *Accountability NOW's signs are obscene-for-minors under* Ginsberg*.*

Having established that the signs are directed to minors, the next step is to consider whether they are obscene for minors.  Under *Ginsberg*, works are obscene for minors if they (i) "taken as a whole, and under contemporary community standards, appeal to the prurient interest *of minors*"; (ii) "depict or describe specifically defined sexual conduct in a way that is patently offensive *for minors*"; and (iii) "taken as a whole, lack serious literary, artistic, political, or scientific value *for minors*."  *Free Speech Coal., Inc. v. Paxton*, 606 U.S. 461, 474 (2025) (citing *Miller v. California*, 413 U.S. 15, 24 (1973); *Ginsberg v. New York*, 390 U.S. 629, 635 (1968)).  The child-rape signs easily satisfy each element.

**i.** Accountability NOW's signs appeal to the prurient interest of minors because their message about "CHILD RAPISTS" and "RAP[ING] LITTLE GIRLS" predominantly invokes in minors a "shameful or morbid interest" in violent and unlawful sex.  "Prurient interest" means a "shameful or morbid interest in nudity, sex, or excretion."  *Roth v. United States*, 354 U.S. 476, 487 n.20 (1957); *Miller*, 413 U.S. at 16 n.1 (quoting challenged statute).  This definition does not include "material that, taken as a whole, does no more than arouse, 'good, old fashioned, healthy' interest in sex."  *Brockett v. Spokane Arcades, Inc.*, 472 U.S. 491, 499 (1985) (citation omitted).

Here, Accountability NOW's child-rape signs appeal to a "shameful or morbid interest in … sex" for minors.  These signs outrageously assert that the President "RAPES LITTLE GIRLS" and that some children's "PARENTS … LOVE CHILD RAPISTS."  Both messages are clearly about child rape.  This explicit reference to a sexual act fits squarely within *Roth*'s definition of "prurient interest," which requires the material to be about "nudity, *sex*, or excretion."

13

*Roth*, 354 U.S. at 487 n.20 (emphasis added).  And a child-rape message obviously does not arouse a "'good, old fashioned, healthy' interest in sex."  *Brockett*, 472 U.S. at 499 (citation omitted). Instead, it piques minors' "shameful or morbid interest" in a particularly repugnant and criminal category of sex.

Accountability NOW contends that its child-rape signs cannot be obscene for minors unless they are "erotic," meaning that they "tend to arouse sexual desire."  Renewed Mot. at 15.  Its sole basis for this argument is an out-of-context footnote in *Erznoznik v. City of Jacksonville* about nonsexual nudity.  422 U.S. 205, 213 n.10 (1975).  There, the Supreme Court recognized that a broad ban on nudity at theaters "would bar a film containing a picture of baby's buttocks, the nude body of a war victim, or scenes from a culture in which nudity is indigenous," so it explained that "[c]learly all nudity cannot be deemed obscene even as to minors," *id.*, and, instead, that "'such expression must be, in some significant way, erotic,'" *id.* at 213 n.10 (quoting *Cohen v. California*, 403 U.S. 15, 20 (1971)).  This message in this case, however, is not about innocent nudity or nonsexual expression; it is about criminal sexual conduct—*i.e.*, the "RAPE[]" of "LITTLE GIRLS"—that cannot be described as platonic under any community standard.[12]

Accountability NOW's argument that its child-rape signs cannot be obscene for minors unless they "tend to arouse sexual desire" misunderstands obscenity doctrine and human biology. Doctrinally, a message may appeal to a prurient interest even if it is "not one of sexual arousal." *United States v. Guglielmi*, 819 F.2d 451, 455 (4th Cir. 1987), *cert. denied* 484 U.S. 1019 (1988). "Rejection and disgust" suffice because it would make little sense if "the most offensive material has constitutional protection while less offensive material does not."  *Id.*

---

[12] Accountability NOW does not identify which "contemporary community standard" by which to evaluate its message.  But whether its signs are evaluated under a national or D.C. standard, their references to child rape appeal to a shameful or morbid interest in sex.

14

Biologically, minors of a certain age do not respond to prurient messages in the same way as adults or adolescents. Yet the government's "power to prohibit distribution of sexual material to minors is at its peak when the target audience for the material is," as here, "very young children." *Butt v. State*, 398 P.3d 1024, 1029 (Utah 2017) (discussing *Erznoznik*, 422 U.S. at 214 n.11). So it cannot be that the obscene-for-minors doctrine protects only minors who are old enough to experience sexual arousal while leaving the most "vulnerable and impressionable minors" susceptible to obscenity. *Id.* (explaining that if the "prurient interest test" were pegged to "a minor's capacity for sexual arousal, … no materials distributed to [young children] could ever be considered obscene as to minors").

Accountability NOW's child-rape signs do not invoke sexual arousal, but they certainly invoke rejection and disgust. NPS was thus on particularly strong footing to ask Accountability NOW to remove those signs given that they explicitly targeted "KIDS." The Court should take their message at face value and find that a message directed at "KIDS" about how their "PARENTS … LOVE CHILD RAPISTS" and accusing a public figure of "RAP[ING] LITTLE GIRLS" appeals to a morbid or shameful interest in sex.

**ii.** Accountability NOW's child-rape message is patently offensive for minors because it accosts children with a graphic description of violent sexual crimes in terms that, judged by prevailing community standards, are unsuitable for them.

Material is patently offensive if it "goes substantially beyond customary limits of candor and affronts contemporary community standards of decency." *Miller*, 413 U.S. at 31. In the context of obscenity doctrine, "customary limits of candor" means that which is accepted—not

merely tolerated—by a given community.[13]   Accordingly, with respect to minors, the right

benchmark is the "prevailing standards in the adult community as a whole with respect to what is

suitable material for minors."  *Ginsberg*, 390 U.S. at 633 (citation omitted); *see Free Speech Coal.*,

606 U.S. at 474 (explaining that works may be obscene if they "depict or describe specifically

defined sexual conduct in a way that is patently offensive *for minors*" (citing *Miller*, 413 U.S. at

24; *Ginsberg*, 390 U.S. at 635)).

Signs directed at "KIDS" in public places that say a well-known figure "RAPES LITTLE

GIRLS" and that some children's "PARENTS … LOVE CHILD RAPISTS" go far beyond

"customary limits of candor" (or even decency).  In no sense does this message about a criminal

sexual act represent "[f]reedom from mental bias, openness of mind; fairness, impartiality, justice,"

2 Oxford English Dictionary 66 (2d ed.) (1978) (defining candor), or "the quality of being open,

honest, and sincere," Webster's Third Int'l Dictionary 326 (1971) (same).  At best, Accountability

NOW buys into conspiracy theories and is recklessly promoting them.  But a conspiracy theory

associating children's parents with child rape, while potentially suitable for an adult, is unsuitable

for Accountability NOW's target audience—"KIDS."  Perhaps this is why Accountability NOW

paraphrases its signs' message when trying to argue that it is not patently offensive in its briefs.

*See* Renewed Mot. at 13 (characterizing its "KIDS" sign as one that "reference[s] 'child rapists'").

Nor does *Cohen v. California* call for a different result.  *Contra* Pl.'s Br. at 13–15 (citing

*Cohen*, 403 U.S. 15).  Unlike the child-rape signs in this case, Mr. Cohen's jacket did not explicitly

---

[13] Various circuits have explained that acceptance, not tolerance, is the appropriate standard "because a community can be said to put up with a number of disagreeable circumstances that it cannot stop."  *United States v. Pryba*, 900 F.2d 748, 759 (4th Cir. 1990); *accord Hoover v. Byrd*, 801 F.2d 740, 742 (5th Cir. 1986) ("To incorporate a requirement of 'tolerance' within the definition of 'community standards' not only turns the notion of standards upside down, but it also undermines the goal of *Miller* to permit differing levels of obscenity regulation in … diverse communities.").

16

refer to sexual conduct or target children. *Id.* at 16. It expressed a four-letter expletive cursing the draft but did not mention any sexual act or use the expletive in a sexual sense. *Id.* By contrast, Accountability NOW's signs explicitly refer to a sexual act and use the term "RAPE" in its ordinary criminal sexual sense. And they do so by directly targeting "KIDS." If Accountability NOW's signs merely cursed a political figure or decision like Mr. Cohen's jacket, *Cohen* might provide some support. But because these signs direct a facially sexual message to children, *Cohen* is beside the point.

      **iii.** Accountability NOW's signs, taken as a whole, lack serious literary, artistic, political, or scientific value for minors. Under *Miller*'s third prong, material may be found obscene if it, "taken as a whole, lacks serious literary, artistic, political, or scientific value." *Miller*, 413 U.S. at 24. In defining this standard, the Supreme Court rejected the stricter "utterly without redeeming social value" test set forth in pre-*Miller* plurality opinions. *Id.* at 24 & n.7 (discussing *Memoirs v. Massachusetts*, 383 U.S. 413, 419 (1966)). It also rejected, "as a constitutional standard, the ambiguous concept of 'social importance.'" *Id.* at 24 n.7 (quoting *id.* at 462 (White, J., dissenting)). In rejecting these stricter tests, the Supreme Court explained that a "quotation from Voltaire in the flyleaf of a book will not constitutionally redeem an otherwise obscene publication…." *Id.* (quoting *Kois v. Wisconsin*, 408 U.S. 229, 231 (1972)).

      *Miller*'s third prong asks whether the potentially obscene material in question has enough "serious" value to redeem its offensive qualities. And the "proper inquiry is not whether an ordinary member of any given community would find serious literary, artistic, political, or scientific value in allegedly obscene material, but whether a *reasonable person* would find such value in the material, taken as a whole." *Pope v. Illinois*, 481 U.S. 497, 500–01 (1987) (emphasis added). So, the relevant question is whether a reasonable person would find that the potentially

17

obscene material has serious value *for minors*. *See Free Speech Coal.*, 606 U.S. at 474 (citing *Miller*, 413 U.S. at 24; *Ginsberg*, 390 U.S. at 635) (explaining how *Miller* adapts to minors).

Accountability NOW's child-rape signs have no redeeming value for minors (or even adults). These signs, without redeeming context, invoke heinous sex crimes, frivolously accuse the President of those crimes (with reference to "LITTLE GIRLS"), and say that some children's "PARENTS … LOVE CHILD RAPISTS." They do not explain that they are mere rhetoric or innuendo. And they target "KIDS," who cannot be expected to understand their veiled meaning, related conspiracy theories, or the broader political context to which the signs vaguely allude.

It may be true that the signs "sparked conversations between … volunteers" and passersby. Renewed Mot. at 13–14 (quoting First Carey Decl. ¶ 4). Even so, the relevant question is not whether the signs have serious value for the public at large, but whether they have serious value *for minors*. Accountability NOW does not, and cannot, say that these signs engendered healthy political discussion among minors or between minors and their parents. These signs frustrate that sort of discussion by explicitly accusing many "PARENTS" of loving "CHILD RAPISTS."

Because Accountability NOW's child-rape signs appeal to the prurient interest of minors, are patently offensive to minors, and lack serious value for minors, they are obscene for minors and unprotected by the First Amendment when directed at them.

### 3. *NPS's request satisfies rational-basis review.*

Because NPS's request that Accountability NOW take down its child-rape signs pertains only to unprotected speech, the Court should apply rational-basis review here. *Free Speech Coal., Inc. v. Paxton*, 606 U.S. 461, 471 (2025). Under rational-basis review, an action will be upheld "'if there is any reasonably conceivable state of facts that could provide a rational basis'" for it. *Id.* at 471–72 (quoting *FCC v. Beach Commc'ns, Inc.*, 508 U.S. 307, 313 (1993)).

18

Here, one reasonable justification for Defendants' request is "protecting *children* from sexually explicit speech." *Id.* at 473 (emphasis in original). Our Nation's "earliest obscenity decisions recognized that restricting obscenity served two distinct interests—curbing the 'corruption of the public mind in general,' *and* protecting 'the manners of youth in particular.'" *Id.* (quoting *Commonwealth v. Sharpless*, 2 Serg. & Rawle 91, 103 (Pa. 1815) (opinion of Yeates, J.); *Commonwealth v. Holmes*, 17 Mass. 336, 336–37 (1821)). This latter interest has long justified regulating materials, like Accountability NOW's, that "manifestly tend[] to the corruption of the morals of youth." *Id.* (quoting five nineteenth-century state laws regulating obscenity) (internal quotation marks omitted).

Since Defendants had a rational basis to ask Accountability NOW to take down its unprotected child-rape signs, Accountability NOW cannot prevail on the merits of its claim.

   4.      *Alternatively, NPS's request survives intermediate or strict scrutiny.*

Alternatively, if the Court finds that NPS's request incidentally burdened adults' access to protected speech, intermediate scrutiny applies. *Free Speech Coal., Inc. v. Paxton*, 606 U.S. 461, 477–78 (2025) (citing *Boy Scouts of America v. Dale*, 530 U.S. 640, 659 (2000)); *see id.* at 485 (explaining that the Supreme Court "has never held that every content-based burden on adults' access to speech that is obscene to minors always triggers strict scrutiny"). Or if the Court finds that NPS outright regulated categorically protected speech based on its content, strict scrutiny applies. *Id.* at 471.[14]

---

[14] Accountability NOW does not allege or argue that Defendants regulated its speech based on viewpoint. *See* Compl. (Dkt. No. 1), Amended Compl. (Dkt. No. 9), First Mot. Prelim. Inj. (Dkt. No. 8), Renewed Mot. Prelim. Inj. (Dkt. No. 27). Nor does it come anywhere near carrying its burden of showing that it is substantially likely to prevail on a hypothetical viewpoint-discrimination claim.

19

**i.** Defendants' request would survive intermediate scrutiny. Under intermediate scrutiny, a governmental action is lawful if it "advances important governmental interests unrelated to the suppression of free speech and does not burden substantially more speech than necessary to further those interests." *Id.* at 495–96 (quoting *Turner Broadcasting System, Inc. v. FCC*, 520 U.S. 180, 189 (1997)) (internal quotation marks omitted).

Defendants' request to Accountability NOW to take down its child-rape signs undoubtedly advances an important governmental interest. As with the Texas statute at issue in *Free Speech Coalition*, Defendants in this case have an "important, even 'compelling'" interest in "shielding children from sexual content." *Id.* (citations omitted). And Defendants' interest is particularly strong because NPS has a statutory duty to "promote and regulate the use of the National Park System … to provide for the enjoyment of the scenery [and] natural and historic objects." 54 U.S.C. § 100100(a). Defendants' request furthers these interests by protecting minors from speech that is obscene—or, at the very least, patently offensive and morally corrupting—for them.

Defendants' request does not burden more speech than is necessary to further these interests. A governmental action is "adequately tailored so long as the government's interest 'would be achieved less effectively absent the regulation' and the regulation 'does not burden substantially more speech than is necessary to further that interest.'" *Free Speech Coal.*, 606 U.S. at 496 (quoting *TikTok v. Garland*, 604 U.S. 56, 70 (2025)). The regulation "need not be the least restrictive … means of" serving the government's interest, *id.* (quoting *Ward v. Rock Against Racism*, 491 U.S. 781, 798 (1989)) (internal quotation marks omitted), and its "validity does not turn on [a court's] agreement with the [government] concerning the most appropriate method for promoting significant government interests or the degree to which those interests should be promoted." *Id.* (quoting *Ward*, 491 U.S. at 800) (internal quotation marks omitted).

20

Here, Defendants' request is exceedingly narrow. Rather than outright revoke Accountability NOW's permit, Defendants merely asked it to take down two signs with an obscene message about child rape directed at minors. This choice did not burden any more speech than necessary to protect minors from Accountability NOW's child-rape message.

**ii.** Defendants' request would also survive strict scrutiny. Strict scrutiny requires a government regulation "to be the least restrictive means of achieving a compelling governmental interest." *Id.* at 484. And although it is "highly rigorous," "strict scrutiny … need not be a death sentence." *Id.* at 500, 508 (Kagan, J., dissenting).

Defendants have a compelling governmental interest in protecting minors from displays about child rape. In *Free Speech Coalition*, both the majority and dissenting opinions recognized that the government's interest in protecting children from sexual content is compelling. *Id.* at 496 ("Texas's interest in shielding children from sexual content is important, even 'compelling.'" (citation omitted)); *id.* at 509 (Kagan, J., dissenting) ("The majority is right that a State has a compelling interest in shielding children from the obscene-for-children materials that [the Texas statute] covers."). Here, NPS's efforts to protect children from explicit signs about child rape are similarly compelling even if those signs do not actually display pornographic materials.

And the Supreme Court has broadly recognized a "compelling interest in protecting the physical and psychological well-being of minors." *Sable Commc'ns of Calif., Inc. v. FCC*, 492 U.S. 115, 126 (1989). "This interest extends to shielding minors from the influence of literature that is not obscene by adult standards." *Id.* (citing *Ginsberg*, 390 U.S. at 639–40; *New York v. Ferber*, 458 U.S. 747, 756–57 (1982)). These interests are particularly salient in the light of the many permitted events celebrating America's 250th anniversary, which are bringing families and visitors of all ages from across the United States to our Nation's capital.

21

Finally, NPS's request that Accountability NOW takes down its child-rape signs was narrowly tailored to further a compelling governmental interest. Here, NPS asked Accountability NOW only to stop displaying these two signs about child rape; it did not ask Accountability NOW to remove other messages that were not directed to children and about child rape (or did not encourage political violence). As soon as Accountability NOW took down its child-rape signs, it was free to replace them with any other compliant signs per its demonstration permit. In short, it is difficult to imagine a much narrower fashion in which NPS could have furthered its compelling governmental interest. And "[t]he First Amendment requires that [a governmental action] be narrowly tailored, not that it be 'perfectly tailored.'" *Williams-Yulee v. Fla. Bar*, 575 U.S. 433, 455 (2015) (quoting *Burson v. Freeman*, 504 U.S. 191, 209 (1992) (plurality op.)).

**B.    The request that Accountability NOW take down its "86-47" flag does not violate its First Amendment rights.**

At the outset, the "86-47" flag is not constitutionally protected speech for reasons explained in Defendants' prior brief and at oral argument. *See* Dkt. No. 13 (Defs.' Resp. to TRO App.). Defendants recognize that this Court held otherwise and preserve all contrary arguments. Defendants also add that Accountability NOW's "PARTY … WHEN HE'S DEAD" sign and the fact that it started displaying its "86-47" messages only after widespread reporting about its threatening meaning are relevant context that the Court should consider. Ex. A (Sheffer Decl.) at 6 ("PARTY … WHEN HE'S DEAD" sign); *supra* at 6–7 (discussing widespread reporting).

But even accepting the Court's prior ruling, Defendants' request that Accountability NOW take down its "86-47" displays satisfies strict scrutiny because U.S. Park Police made its narrow request to further a compelling governmental interest. Strict scrutiny requires a government regulation "to be the least restrictive means of achieving a compelling governmental interest," *Free*

22

*Speech Coal., Inc. v. Paxton*, 606 U.S. 461, 484 (2025). And, although it is "highly rigorous," it "need not be a death sentence." *Id.* at 500, 508 (Kagan, J., dissenting).

**i.** Defendants have a compelling governmental interest in preventing and deterring political violence. In fact, "the Nation undoubtedly has a valid, even an *overwhelming*, interest in protecting the safety of its Chief Executive and in allowing him to perform his duties without interference from threats of physical violence." *Watts v. United States*, 394 U.S. 705, 707 (1969) (citing H.R. Rep. No. 652, 64th Cong., 1st Sess. (1916)).

Here, the U.S. Secret Service has explained that "[t]oday's threat environment is heightened, real, and dynamic" and that "[a]cts of violence against the President, Vice President, and protected sites are occurring at an ever-increasing pace." Dkt. No. 13-1 (Quinn Decl.) at ¶ 7. In the past two months—all during the pendency of this litigation—a "gunman opened fire … at the White House Correspondents' Association Dinner," another "individual shot at Secret Service Police Officers near the Holocaust Museum in Washington, D.C., and along the route traveled by the Vice President," and "an individual fired shots within yards of the White House Complex." *Id.* Just days ago, five men were arrested and charged for plotting to kill government officials and others at the White House during the Ultimate Fighting Championship 250 event. Press Release, *Five men arrested & charged in plot to attack & kill government officials, others attending Ultimate Fighting Championship at White House*, U.S. DEP'T OF JUST. (June 16, 2026).[15]

Given this heightened threat environment, the Secret Service "regard[s] the statement '86-47' as a potential call for acts of violence directed at the President of the United States." Quinn Decl. at ¶ 8. It also "view[s] the statement '86-46' and other variations to represent potential

---

[15] Available at https://www.justice.gov/usao-sdoh/pr/five-men-arrested-charged-plot-attack-kill-government-officials-others-attending [https://perma.cc/B3Y2-A35R].

threats to former living Presidents." *Id.* Accordingly, the Secret Service concludes that "the statement '86-47' and other variations will be perceived as a potential threat against the protectee and as one that could incite others to engage in an unwanted outcome against the protectee." *Id.* at ¶ 9.

Defendants do not dispute that the term "86" can mean "to get rid of" or "to throw out." *See* Renewed Mot. at 16. In the context of this case, however, it is reasonable that the Secret Service (or any impartial observer) construes "86" as threatening or inciteful. Accountability NOW began displaying its "86-47" messages only after widespread media reporting about people using "86-47" to convey a threat to President Donald J. Trump. *See* Dkt. No. 10-2 (Second Carey Decl.) at ¶ 4; *see, e.g.*, A. D. Richer & E. Tucker, *Ex-FBI Director Comey indicted again, in a probe over an online post officials call a Trump threat*, AP (Apr. 28, 2026) (reporting that "folks associate" "86-47" with political violence). Thus, when Accountability NOW began displaying its "86-47" flag and when the U.S. Park Police ordered it taken down, the term "86" was (and continues to be) understood as a threat or incitement.

Moreover, Accountability NOW's other displays support the Secret Service's interpretation of Accountability NOW's "86-47" flag as threatening and inciteful and the NPS's actions based on that assessment. Importantly, in the weeks before it displayed its "86-47" flag, Accountability NOW displayed a sign that read "PARTY AT FLARE ***WHEN HE'S DEAD***." Ex. A (Sheffer Decl.) at 6 (emphasis added). It also displayed a balloon depicting a green man sexually assaulting the President next to its "86-47" flag. Dkt. No. 19 (Pl.'s Photographic Filing) at 0:08–0:21 (depicting the "86-47" flag and surrounding context on May 14, 2026). Given this context and NPS's discussion with the Secret Service about the "86-47" flag the day before NPS ordered it taken

down, Dkt. No. 16 (Defs.' Suppl. Filing in response to Pl.'s TRO App.) at 1–2, NPS's request furthered a compelling governmental interest.

**ii.** NPS's request was narrowly tailored. NPS asked Accountability NOW only to remove one "86-47" flag; Accountability NOW's demonstration permit was neither revoked nor amended to impose additional restrictions. Given that NPS's request was limited to one flag, it could not have pursued its compelling governmental interest in deterring potential violence associated with the "86-47" message any more narrowly than it did.

Notably, Accountability NOW says it considers "86" to mean "impeach" or "remove" but recognizes it can mean "to kill," Renewed Mot. at 16, and NPS has not asked Accountability NOW to take down any impeachment-and-removal displays. NPS's request leaves Accountability NOW with ample opportunity to express its impeachment-and-removal message without displaying a message that also conveys "to kill."

## II.    ACCOUNTABILITY **NOW** WILL NOT SUFFER IRREPARABLE HARM IN THE ABSENCE OF A PRELIMINARY INJUNCTION.

Defendants do not contest that, under D.C. Circuit precedent, "[t]he loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury." TRO Op. at 18 (quoting *Pursuing Am.'s Greatness v. Fed. Election Comm'n*, 831 F.3d 500, 511 (D.C. Cir. 2016)). Nonetheless, Accountability NOW has not suffered the loss of any First Amendment freedoms in connection with its child-rape signs or "86-47" flag for the reasons discussed in Part I.

25

### III.    THE BALANCE OF THE EQUITIES AND THE PUBLIC INTEREST FAVOR DEFENDANTS.

When the government is the defendant, the balance-of-the-equities and public-interest factors merge.  *Karem v. Trump*, 960 F.3d 656, 668 (D.C. Cir. 2020) (quoting *Nken v. Holder*, 556 U.S. 418, 435 (2009)).  These factors weigh heavily against a preliminary injunction here.

**A.** The balance of the equities and the public interest weigh against a preliminary injunction enabling Accountability NOW to obscene signs about child rape during the pendency of this litigation.  Irrespective of any injunction, Accountability NOW still has its demonstration permit and may exercise its First Amendment rights by displaying non-obscene messages.  In fact, it has continued to display offensive messages expressing its contempt for the President.  Individuals certainly have a First Amendment right to engage in protected speech, but no such speech is implicated when the government merely asks a speaker to take down obscene-for-minors signs directed at "KIDS."

Against this backdrop, Defendants and the public have a strong interest in protecting children from obscene or otherwise patently offensive sexual messages on federal lands.  This interest is amplified when that message is explicitly directed at "KIDS" and attempts to frustrate their relationship with their "PARENTS" by accusing them of sympathy for "CHILD RAPISTS."  And with families and visitors of all ages coming to our Nation's capital to celebrate America's 250th anniversary during the pendency of this litigation, the interests weighing against an injunction are particularly acute.

**B.** The balance of the equities and the public interest weigh against a preliminary injunction enabling Accountability NOW to display its "86-47" flag during this litigation.  The U.S. Secret Service has explained that it construes "86" as "a potential call for acts of violence directed at the President of the United States," and that "[t]oday's threat environment is heightened,

26

real, and dynamic." Quinn Decl. ¶ 7–8. In the light of several recent shooting events involving the President and White House—and thwarted efforts like the alleged conspiracy to attack spectators at the White House during UFC Freedom 250—there is an overwhelming interest against enjoining NPS from removing "86" displays while these threats persist—and while the District of Columbia hosts an influx of visitors of all ages in celebration of 250 years of our Nation's independence.

Accountability NOW's argument to the contrary amounts to no more than asserting that it is correct on the merits and therefore must win on the balance of the equities. It bears repeating, however, that Accountability NOW's permit remains intact. It may continue to demonstrate. It may even continue to display messages about impeachment and removal that it claims are synonymous with its "86-47" message. Accountability NOW's alleged harms and the public interest in its favor, if any, are slight compared to the unprecedented recent political violence. The Court should deny Accountability NOW's motion for a preliminary injunction.

## IV.    ACCOUNTABILITY NOW'S REQUESTED RELIEF IS OVERBROAD.

Accountability NOW's requested relief is overbroad. In addition to the two child-rape signs and one "86-47" flag detailed in the Amended Complaint, Dkt. No. 9, Accountability NOW asks the Court in its Renewed Motion to extend the breadth of its requested injunction to include other signs and banners. Dkt. No. 27 at 24–25. NPS has never taken any action with respect to these displays, and there is no basis whatsoever to speculate that it someday might.[16] Any injury

---

[16] Accountability NOW has suggested that NPS's compliance checks are menacing and unprecedented. *See* Dkt. No. 18 (Pl.'s Reply to Defs.' Suppl. Filing on TRO Mot.) at 3. Specifically, it says that "photography by NPS did not occur before Plaintiff filed its motion for a preliminary injunction in this lawsuit," *id.* at 3, and its permitholder declared, "On Thursday morning, May 28, 2026, at about 9 a.m., a Park Service employee visited our demonstration site

27

with respect to them is conjectural, speculative, and hypothetical, so Accountability NOW does not have standing to seek an injunction with respect to them or the various other displays that went unmentioned in its Amended Complaint.  *See Spokeo, Inc. v. Robins*, 578 U.S. 330, 339 (2016) ("To establish injury in fact, a plaintiff must show that he or she suffered 'an invasion of a legally protected interest' that is 'concrete and particularized' and 'actual or imminent, not conjectural or hypothetical.'" (quoting *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560 (1992))).

And, for the reasons explained by this Court in its July 15 Order, Accountability NOW's request that the Court order "Defendants to provide two business days' notice of any [permit] revocation" is inappropriate.  *Compare* Renewed Mot. at 24 *with* Dkt. No. 29 (July 15 Order) at 3–4 nn. 1.  Not only does Accountability NOW lack standing to seek an injunction based on a hypothetical, the fact that NPS issued two amended permits to Accountability NOW since asking it to take down its child-rape signs undermines any "concern" that NPS might improperly revoke its permit.

## CONCLUSION

For these reasons, Court should deny Accountability NOW's Renewed Motion for Preliminary Injunction.

---

and took many photographs of the demonstration.  This has not happened before."  Dkt. No. 15-1 (Third Carey Decl.) at ¶ 3; *see* Dkt. No. 18-1 (Fourth Carey Decl.) at ¶ 2 (similar).

These assertions are demonstrably false.  As Mr. Sheffer's declaration makes clear, one such compliance check with photography occurred on April 14, 2026—before Accountability NOW filed any complaint or preliminary-injunction motion.  Sheffer Decl. ¶ 4–10.  And "[t]aking photographs is a regular practice of … events compliance monitors" in the National Mall and Memorial Parks Division of Permits Management in the NPS.  *Id* at ¶ 6.

28

June 17, 2026

Respectfully submitted,

STANLEY E. WOODWARD, JR.
D.C. Bar No. 997320
Associate Attorney General

JOHN K. ADAMS
Illinois Bar No. 6323541
Deputy Associate Attorney General

/s/      *Devin A. Froseth*
DEVIN A. FROSETH
Florida Bar No. 1074655
Counsel to the Associate Attorney General

U.S. Department of Justice
950 Pennsylvania Avenue, Northwest
Washington, D.C. 20530
202-514-2000
devin.a.froseth@usdoj.gov

*Counsel for Defendants*

29