**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| ACCOUNTABILITY NOW USA, | |
| *Plaintiff*, | |
| v. | Civil Action No. 26-1385 (RDM) |
| KEVIN GRIESS, *Superintendent of the National Mall and Memorial Parks*, *et al.*, | |
| *Defendants*. | |

**<u>MEMORANDUM OPINION</u>**

"Freedom of speech is a bedrock constitutional right[,] . . . [and] [p]olitical speech in particular is the lifeblood of American democracy." *United States v. Trump*, 88 F.4th 990, 1002 (D.C. Cir. 2023). This case involves the political speech of Plaintiff Accountability NOW USA ("Accountability Now"), an unincorporated association that maintains a 24/7 demonstration calling for the impeachment and removal of President Donald Trump on National Park Service ("NPS") land. Claiming that two of Plaintiff's signs containing references to President Trump's alleged rape of a minor are "obscene" and, separately, that Plaintiff's flag with the legend "8647" constitutes a "true threat" against the President in violation of 18 U.S.C. § 871, the NPS instructed Plaintiff to remove these displays or face the revocation of its demonstration permit. In light of that threat, Plaintiff complied with both requests, but it still wants to engage in the challenged speech.

To that end, Plaintiff brings this First Amendment action challenging the NPS's threatened revocation of its demonstration permit. Dkt. 1 (Compl.). It previously moved for a temporary restraining order ("TRO") precluding the Superintendent of the National Mall and

Memorial Parks, Kevin Griess, and Secretary of the Interior Doug Burgum ("Defendants") and their agents and delegees "from taking enforcement action against them because of their display of [the] flag." Dkt. 10 at 1. Concluding that Plaintiff was likely to succeed on the merits of its claim that its "8647" flag constitutes protected political speech, this Court issued a TRO precluding Defendants from either confiscating Plaintiff's "8647" flag or revoking Plaintiff's demonstration permit on account of that flag. *See* Dkts. 20 & 21. With minor modifications, the Court extended that order 14 days later. *See* Dkt. 29. The TRO is set to expire at the end of the day on June 29, 2026. *See id.*; *see also* Fed. R. Civ. P. 6(a)(1)(A), (C).

Plaintiff now moves for a preliminary injunction seeking to "prevent Defendants from revoking Plaintiff's demonstration permit or destroying its property based on its display" of the two signs accusing President Trump of rape and its materials containing the "8647" legend. Dkt. 27 at 9. Given the narrow focus of Plaintiff's claims and the absence of any evident factual dispute, the Court ordered the parties to show cause why it should not treat Plaintiff's pending motion as a motion for summary judgment and resolve the case on the merits. Min. Order (June 18, 2026); *see* Fed. R. Civ. P. 65(a)(2). In response, the "[p]arties agree[d] that there are no materially disputed facts relevant to Plaintiff's claim," and they did not "object[] to" consolidation of the motion for a preliminary injunction with final resolution of the case on the merits. Dkt. 35 at 1. The Court will, accordingly, treat Plaintiff's pending motion as a motion for summary judgment. The only question before the Court, then, is whether in light of the undisputed factual record, the two signs accusing President Trump of rape and the "8647" materials fall outside the scope of First Amendment protection, as the NPS maintains, or whether they constitute protected political speech, as Plaintiff asserts. If the materials constitute fully

protected speech, all agree that the NPS lacks authority to compel their removal or to revoke

Plaintiff's permit for displaying them.

As explained below, the Court concludes that Plaintiff is entitled to prevail as a matter of

law.  Plaintiff's signs accusing President Trump of raping a minor might outrage or offend some,

but they do not, by any measure, cross the line from protected political speech to unprotected

obscenity.  That is true, moreover, even under the less demanding obscene-as-to-minors

standard.  Similarly, Plaintiff's "8647" flag and similar materials, which were displayed along

with other materials calling for President Trump's removal from office, do not constitute a "true

threat" or criminal "incitement" to violence.  Rather, both sets of materials represent core

protected speech, and, as a result, the NPS may not compel their removal or condition Plaintiff's

continuing entitlement to a demonstration permit on Plaintiff's refraining from that speech.

"Whatever differences may exist about interpretations of the First Amendment, there is

practically universal agreement that a major purpose of that Amendment was to protect the free

discussion of governmental affairs." *Mills v. Alabama*, 384 U.S. 214, 218 (1966).  Most

fundamentally, this means that it is not the job or prerogative of the government to police the

content of political speech.  The vitality of this essential dictate, moreover, depends on ensuring

that the narrow exceptions to First Amendment protection for obscenity, true threats, and

criminal incitement do not become gaping loopholes, which permit government censorship

whenever an agency or government official chooses to apply one of those labels to controversial

speech about government affairs or officials.  There may be occasions, to be sure, when political

speech crosses the line and, for example, incites imminent violence.  But the category of

unprotected speech is exceedingly narrow, and the determination that speech is unprotected

cannot be made lightly or without substantial factual support.  Because the displays at issue here

3

convey political messages and do not fall within any of the narrow exceptions to First Amendment protection, the NPS may not revoke Plaintiff's demonstration permit based on the content of that speech and may not confiscate or remove the materials merely because they are being displayed (with a lawful permit) on National Park property.

Although the Court's opinion is lengthy, that does not mean that this is a hard case. It is not. Plaintiff's signs and flag fall well within the heartland of protected First Amendment speech, and Defendants offer no plausible basis for suppressing Plaintiff's core, political speech. If "hard cases[] make bad law," *N. Sec. Co. v. United States*, 24 S. Ct. 436, 468 (1904) (Holmes, J., dissenting), one can only hope that easy cases make good law.

The Court will, accordingly, **GRANT** Accountability Now's Motion for Summary Judgment. Dkt. 27.

## I. BACKGROUND

The following facts are based on the parties' declarations and other submissions and are, as the parties agree, undisputed. *See* Dkt. 35 at 1.

Plaintiff Accountability Now is an unincorporated association that holds a permit from the NPS to conduct "a demonstration near the George Meade Statue on Constitution Avenue in Washington, D.C." Dkt. 8-1 at 1 (Carey Decl. ¶¶ 1–2). "Volunteers maintain the demonstration twenty-four hours a day, seven days a week" at which they "engage in face-to-face conversations with members of the public[] to call attention to the rise of fascism in the United States and [to] demand the impeachment of President Trump." *Id.* (Carey Decl. ¶ 2). Plaintiff's "current permit was issued on April 13, 2026, and is valid through August 12, 2026[,]" and Plaintiff "intends to obtain another permit when the current permit expires, at the same or another location on NPS-managed land in the District of Columbia." *Id.* at 2 (Carey Decl. ¶ 3).

On February 24, 2026, in response to reporting "that the Justice Department was withholding more than 50 pages of FBI interviews with a woman who had accused Donald Trump of sexually abusing her when she was a minor[,]" Plaintiff began to display two new signs at the demonstration.  *Id.* (Carey Decl. ¶ 4).  One sign reads: "TRUMP RAPED LITTLE GIRLS."  *Id.*  The other reads: "KIDS, IF YOUR PARENTS ARE MAGA, THEY LOVE CHILD RAPISTS."  *Id.*  According to Plaintiff, "[t]he display of those signs has engendered numerous conversations between volunteers and passersby regarding President Trump's behavior, morality, and fitness to continue in office."  *Id.*

On April 14, 2026, the day after Plaintiff's most recent permit was issued, Griess called two NPS officials, Marisa Richardson, the Chief of the Division of Permits Management, and Supervisory Park Ranger Thomas Sheffer, and directed them to have an agent from the Permits Office "go to the site of the demonstration to take photographs of the signs and send them to him." Dkt. 31-2 at 1 (Sheffer Decl. ¶ 3).  "Permit monitoring," which involves, among other things, "taking photographs of permitted sites to document the condition of NPS resources and ensure compliance with permit terms and conditions," is a "regular practice of . . . Permits Office events compliance monitors[.]"  *Id.* at 2 (Sheffer Decl. ¶¶ 5–6).  An NPS events compliance monitor went to the site "[l]ate in the morning of April 14, 2026," and took photographs, which were then "saved . . . to the administrative record of Accountability Now's permit."  *Id.* (Sheffer Decl. ¶ 7).  The photographed signs include the two signs accusing President Trump of committing rape, a banner that reads "IMPEACH. CONVICT. REMOVE[,]" and a sign, which was on the other side of the sandwich board that had the "TRUMP RAPED LITTLE GIRLS," sign, which reads: PARTY AT FLARE WHEN HE'S DEAD.  *Id.* at 4–7 (Sheffer Decl. Attachments); *see also* June 23, 2026 Hrg. Tr. (Rough at 28).  Later that afternoon, Sheffer and

Richardson "met with representatives of Accountability N[ow] at the permitted demonstration site." Dkt. 31-2 at 3 (Sheffer Decl. ¶ 10). Plaintiff's counsel informed the Court during oral argument that during that conversation, the NPS agents requested that the two child rape signs be taken down, although it is not clear whether the NPS officials provided a reason for the request during the conversation. June 23, 2026 Hrg. Tr. (Rough at 3–4).

Richardson also emailed Anita Carey, an organizer with Accountability Now who is listed as the "Person[] in Charge" on Plaintiff's permit, Dkt. 17 at 1 (Pl.'s Ex. 1 at 1), that same day, relaying the following message from Griess: "Based on the photographic evidence from earlier today, the [Plaintiff's] first amendment permit is displaying unprotected obscenity in signs or media. This is not protected by the first amendment and is therefore prohibited and a violation of law," Dkt. 8-1 at 2–3 (Carey Decl. ¶ 5). Carey responded to Griess directly, "seeking clarification of NPS's position and asking, in particular, why NPS believes the signs meet the legal definition of obscenity and what would happen if the signs remain on display." *Id.* at 3 (Carey Decl. ¶ 6). Griess responded as follows on April 15, 2026:

> Thank you for your message. We appreciate your cooperation as we work to ensure that all permitted activities remain in compliance with federal requirements.
>
> To clarify, the material displayed under your permit has been evaluated under all appropriate standards and tests and is deemed unprotected obscenity, which the Court has established is not protected by the First Amendment. This determination is supported by federal law which prohibits obscene material on federal property.
>
> Because obscenity is unlawful on federal land, we must ask that the material be removed.
>
> The National Park Service may impose and enforce permit conditions to prevent unlawful conduct, including the display of obscene materials prohibited under federal law. All activities conducted under an NPS permit must remain lawful and in compliance with permit conditions. If a permittee chooses not to comply

with a lawful direction to cease prohibited conduct, the National Park Service
may take further steps as appropriate to ensure compliance.

*Id.* (Carey Decl. ¶ 7).  The email does not specify what "appropriate standards and tests" were

used to evaluate the materials or what federal law "prohibits obscene material on federal

property."  Neither Richardson nor Griess suggested that they were concerned that children

might see the signs or that the signs, even if protected as to adults, were obscene as to minors.

"Based on these communications and the recent experiences of other NPS permit holders

whose demonstrations were critical of President Trump," Accountability Now concluded that it

faced "a realistic and imminent threat that its demonstration permit [would] be summarily

revoked or its signs removed, with minimal or zero notice" and that "[r]evocation [might] result

in the destruction of its valuable property, including its tents, tables, chairs, sound equipment,

and literature."  *Id.* (Carey Decl. ¶ 8).  In particular, Plaintiff concluded "Defendant Griess's

message that the signs were 'unlawful' and that NPS would 'take further steps as appropriate to

ensure compliance'" meant that the NPS would either "summarily revoke its permit and

dismantle its demonstration or [would] remove the signs with little or no notice."  *Id.* at 4 (Carey

Decl. ¶ 10).  That conclusion was further bolstered by Griess's request "that the material be

removed" "[b]ecause obscenity is unlawful on federal lands" and his observation that "[a]ll

activities conducted under an NPS permit must remain lawful and in compliance with permit

conditions."  *Id.* at 3 (Carey Decl. ¶ 7).  "[I]n order to forestall" such an "enforcement action,"

Plaintiff "temporarily removed the signs" at issue, filed this lawsuit, and unsuccessfully

attempted to negotiate a resolution of the dispute with the NPS.  *Id.* at 4 (Carey Decl. ¶ 11).

Plaintiff filed a motion for a preliminary injunction on May 26, 2026, Dkt. 8, seeking an order

barring Defendants from "taking any action" against Plaintiff "in retaliation" for displaying the

two signs, "including revocation of Plaintiff's demonstration permit or seizure of [the] signs." Dkt. 8-2 at 1.

In addition to the two signs discussed above, Plaintiff has been displaying a red, white, and blue flag, which one of Plaintiff's volunteers purchased from Amazon, that reads "8647." Dkt. 10-2 at 1–2 (2d Carey Decl. ¶¶ 3–5). The flag was purchased in October 2025 and has been displayed at the demonstration site "on and off since" then as part of Plaintiff's routine rotation of banners and signs. Dkt. 33-1 at 1–2 (6th Carey Decl. ¶¶ 2–3). The flag was on display on the morning of May 12, when two Secret Service officers approached a volunteer at the demonstration and engaged in the following brief conversation:

| | |
|---|---|
| Officer: | How are you? |
| Volunteer: | I'm good.  I'm recording this 'cause they told me to. |
| Officer: | That's fine. |
| Volunteer: | How's it going? |
| Officer: | Not a problem.  Just so you're aware, this is all consensual[.] |
| Volunteer: | Yeah[.] |
| . . . | |
| Officer: | . . . we received a phone call because of the flag, in fact the 86 47 and what it can stand for. |
| Volunteer: | Uh-huh.  I never heard of it standing for anything other than Trump shouldn't be in office. |
| Officer: | OK.  Alright.  So you have no ill-will towards . . . |
| Volunteer: | I want Trump to live forever and rot in jail where he belongs. |
| Officer: | OK.  That's it.  That's all, all I needed to know[.] |
| Volunteer: | OK[.] |

Officer:        We just, we got a call so we just wanted to come down here . . .

Volunteer:      I'm sorry someone wasted your time[.]

Officer.        Oh, you're good.  You're good.  It's part of our job[.]

Volunteer:      Yup[.]

Officer:        We just want to make sure that your First Amendment rights are protected.  They were concerned, so we just want to make sure there's no ill-will.

Volunteer:      OK.  Haha.  Thank you so much.

Officer:        Alright.  Yes, ma'am.

Volunteer:      OK.

Dkt. 15 at 2 (https://photos.app.goo.gl/MyS5T7g7b4JXRYmY6).

Things took a turn for the more confrontational when two different officers approached the same volunteer about 25 minutes later and read her the *Miranda* warnings.  *Id.* at 3.  The volunteer was not in custody at the time, and, despite the officer's representation, her right to court-appointed counsel had not attached.  Although politely delivered, the Secret Service's message was a worrisome one—that is, she was at risk of criminal prosecution for displaying the flag.  Understandably, the volunteer declined to speak with the officers.  *Id.*  The Secret Service opened an investigation into the volunteer as a "potential threat."  Dkt. 13-1 at 4 (Quinn Decl. ¶ 10).  "[The] investigation remains ongoing."  *Id.*

Nothing happened, however, for another two weeks.  But then, "[o]n Tuesday, May 26, . . . the Secret Service shared information with the U.S. Department of the Interior about its ongoing investigation relating to the individual holding a flag displaying the statement '8647' on May 12 in the 300 block of Constitution Avenue, N.W."  Dkt. 16 at 1–2 (citation modified).  The following day—and less than 24 hours after Plaintiff moved for its first preliminary injunction

9

regarding the two rape signs—"four cars of U.S Park Police officers pulled up to Plaintiff's demonstration site" at around 5 a.m. on May 27, and an officer read "the volunteer on duty" the following "from a clipboard:"

> 18 U.S. Code 8741[.]  Threats against the President.  Right now, we're looking at the 8647 as a threat against the President.  Can I ask you to take it down please?  The sign here?

Dkt. 10-2 at 1 (2d Carey Decl. ¶ 2).

All agree that no such provision of the U.S. Code exists and that the officer presumably intended to refer to 18 U.S.C. § 871, Dkt. 10 at 2; Dkt. 31 at 14, which makes it a felony to "knowingly and willfully" threaten "to take the life of . . . or to inflict bodily harm upon the President of the United States."  The volunteer on duty took the flag down.  Dkt. 10-2 at 1 (2d Carey Decl ¶ 2).  The park police officer told the volunteer to "please refrain from putting it back up" and warned that, "[i]f it comes back up[,] we'll be by here again, OK, and then it will be a violation of the permit," *id.*; *see also* Dkt. 10 at 1 (https://photos.app.goo.gl/jtM8Tj7sCnkS4Smg9).

Later that day, Plaintiff filed an amended complaint adding the flag incident as part of its First Amendment challenge to the threatened revocation of its permit and required removal of allegedly unlawful speech.  *See* Dkt. 9 at 6–7 (Am. Compl. ¶¶ 22–26).  Plaintiff simultaneously moved for a TRO to "prevent Defendants from taking enforcement action against [it] because of [its] display of" the flag.  Dkt. 10 at 1.  The following day, the Court heard argument on the motion, *see* Min. Entry (May 28, 2026).  Because Defendants' counsel was unable to offer any description of the agency's actual reasons for concluding that Plaintiff's specific display of the flag posed a true threat—as opposed to conveying a political message urging President Trump's removal from office—the Court provided the parties with an opportunity to supplement the record, *see id.*, and specifically requested that Defendants submit evidence or records addressing

their decision-making process regarding the direction that Plaintiff remove the flag.  May 28, 2026 Hrg. Tr. (Rough at 38, 43, 46).  Both parties made additional submissions.  Dkts. 15, 16, 18, & 19.

On June 1, 2026, the Court issued a TRO regarding Plaintiff's display of its "8647" flag, concluding that Plaintiff was likely to prevail on its claim challenging the threatened revocation of its demonstration permit for displaying the flag.  Dkts. 20 & 21.  On June 10, 2026, Plaintiff filed its renewed motion for a preliminary injunction, which sought relief with respect to (1) the two child rape signs, (2) the "8647" flag, and (3) two additional signs incorporating the "8647" legend.  *See* Dkt. 27 at 32–33.  This final request for relief involves two additional messages that Plaintiff began to display after this Court issued its TRO.  One of these reads "SIGN OUR DECLARATION of SUPPORT" and "CONVICT. REMOVE." and depicts an anthropomorphic raccoon, surrounded by a tree and flowers, holding a petition and waving an "8647" flag.  Dkt. 27-1 at 1 (5th Carey Decl. ¶ 3).  The second is a flag that is very similar to the original "8647" flag—it is also red, white, and blue, and framed by a series of white stars—but, in addition to the "8647" insignia, it includes the phrase "IMPEACH TRUMP."  *Id.* at 2 (5th Carey Decl. ¶ 5).

The next day, Plaintiff sought an extension and expansion of the TRO "to enjoin the revocation of Plaintiff's demonstration permit based on its display" of these additional, similar materials.  Dkt. 29 at 2.  The Court granted the extension on June 15, 2026, and modified the TRO to enjoin Defendants from removing these additional displays or threatening revocation of Plaintiff's demonstration permit based on these displays.  *See generally id.*  The parties completed briefing on the renewed motion for a preliminary injunction on June 22, 2026, *see* Dkt. 34, and the Court heard argument on the motion the following day, *see* Min. Entry (June 23, 2026).  At the Court's invitation, June 23, 2026 Hrg. Tr. (Rough at 49), Defendants filed a

11

surreply on June 25, 2026, Dkt. 36, and with the Court's permission, Min. Order (June 25, 2026),

Plaintiff filed a final declaration that same day, Dkt. 33-1; Dkt. 38. With the parties' consent,

Dkt. 35, the Court now consolidates the pending motion for a preliminary injunction with the

merits, *see* Fed. R. Civ. P. 65(a)(2), and will treat Plaintiff's motion as a motion for summary

judgment, *see* Fed. R. Civ. P. 56.

## II. LEGAL STANDARD

To prevail on a motion for summary judgment, the moving party bears the burden of

demonstrating "that there is no genuine dispute as to any material fact and [that it] is entitled to

judgment as a matter of law." Fed. R. Civ. P. 56(a). A fact is "material" if it is capable of

affecting the outcome of the litigation. *Holcomb v. Powell*, 433 F.3d 889, 895 (D.C. Cir. 2006);

*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A dispute is "genuine" if the

evidence is such that a reasonable factfinder could return a verdict for the nonmoving party. *See*

*Scott v. Harris*, 550 U.S. 372, 380 (2007). In considering a motion for summary judgment, the

Court must resolve all factual disputes and draw "all justifiable inferences" in favor of the

nonmoving party. *Liberty Lobby*, 477 U.S. at 255; *see also Mastro v. Pepco*, 447 F.3d 843, 850

(D.C. Cir. 2006).

The nonmoving party's opposition must consist of more than mere allegations or denials;

instead, it must be supported by affidavits, declarations, or other competent evidence, setting

forth specific facts showing that there is a genuine issue for trial. Fed. R. Civ. P. 56(c); *Celotex*

*Corp. v. Catrett*, 477 U.S. 317, 324 (1986). "[T]he moving party is entitled to judgment as a

matter of law if the nonmoving party fails to make a showing sufficient to establish the existence

of an element essential to its case, and on which it will bear the burden of proof at trial."

*Eddington v. U.S. Dep't of Def.*, 35 F.4th 833, 836–37 (D.C. Cir. 2022) (citation modified). If

12

the nonmoving party's evidence is "merely colorable" or "not significantly probative," the Court should grant summary judgment. *Liberty Lobby*, 477 U.S. at 249–50 (citations omitted).

As noted above, the parties agree that the case is suitable for resolution on summary judgment. Dkt. 35.

### III. ANALYSIS

### A.    Standing

Although Defendants do not challenge Plaintiff's standing, the Court must satisfy itself that it has jurisdiction. *Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 94–95 (1998).

To establish Article III standing, a plaintiff must demonstrate a "concrete and particularized" injury that is "fairly traceable" to the defendant's conduct and "that is likely to be redressed by a favorable judicial decision." *Spokeo, Inc. v. Robins*, 578 U.S. 330, 338–39 (2016) (citation modified). The extent and nature of that burden varies at each "successive stage[] of the litigation." *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 561 (1992). At the summary judgment stage, the moving party "must establish that there exists no genuine issue of material fact as to [standing]." *Dep't of Com. v. U.S. House of Representatives*, 525 U.S. 316, 329 (1999); *see also Public Citizen, Inc. v. Trump*, 361 F. Supp. 3d 60, 83 (D.D.C. 2019). "[I]n assessing plaintiff['s] standing, [the Court] must assume [the plaintiff] will prevail on the merits of [its] constitutional claims." *LaRoque v. Holder*, 650 F.3d 777, 785 (D.C. Cir. 2011).

Here, although Plaintiff does not challenge the constitutionality of a criminal statute, it invokes the standing doctrine developed in the context of First Amendment pre-enforcement challenges. Specifically, Plaintiff contends that it is "being prevented from engaging in political speech by the realistic threat that NPS will summarily revoke [its] demonstration permit and/or dismantle its demonstration should Plaintiff redisplay its signs and/or its flag." Dkt. 27 at 19. Because Plaintiff's "theory of injury is closely analogous to a pre-enforcement challenge,"

13

*Turner v. U.S. Agency for Glob. Media*, 502 F. Supp. 3d 333, 359–60 (D.D.C. 2020), the Court will apply those well-established principles even though Plaintiff challenges the threatened and allegedly unconstitutional revocation of its permit, as opposed to the threatened and allegedly unconstitutional enforcement of a criminal statute. *See*, *e.g.*, *Babbitt v. United Farm Workers Nat'l Union*, 442 U.S. 289, 302 n.13 (1979) ("We think that the prospect of issuance of an administrative cease-and-desist order . . . against such prohibited conduct provides substantial additional support for the conclusion that appellees' challenge to the publicity provision is justiciable." (citation omitted)); *Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 165, 166 (2014) (noting that "administrative action, like arrest or prosecution, may give rise to harm sufficient to justify pre-enforcement review" and considering the threat of administrative action "substantial"); *see also Laird v. Tatum*, 408 U.S. 1, 11 (1972) (referring to First Amendment pre-enforcement "challeng[es] [to the] exercise of government power [that] [is] regulatory, proscriptive, or compulsory in nature"). It bears note, however, that this case involves far more government action directed specifically at Plaintiff and the particular conduct at issue than the typical pre-enforcement action.

"[W]here threatened action by *government* is concerned, [federal courts] do not require a plaintiff to expose himself to liability before bringing suit to challenge the basis for the threat." *MedImmune, Inc. v. Genentech, Inc.*, 549 U.S. 118, 128–29 (2007) (emphasis in original). As the Supreme Court explained in *MedImmune*:

> The plaintiff's own action (or inaction) in failing to violate the law eliminates the imminent threat of prosecution, but nonetheless does not eliminate Article III jurisdiction. For example, in *Terrace v. Thompson*, 263 U.S. 197 (1923), the State threatened the plaintiff with forfeiture of his farm, fines, and penalties if he entered into a lease with an alien in violation of the State's anti-alien land law. Given this genuine threat of enforcement, we did not require, as a prerequisite to testing the validity of the law in a suit for injunction, that the plaintiff bet the farm, so to speak, by taking the violative action. *Id.* at 216. *See*

14

> *also, e.g., Vill. of Euclid v. Ambler Realty Co.*, 272 U.S. 365 (1926); *Ex parte Young*, 209 U.S. 123 (1908).  Likewise, in *Steffel v. Thompson*, 415 U.S. 452 (1974), we did not require the plaintiff to proceed to distribute handbills and risk actual prosecution before he could seek a declaratory judgment regarding the constitutionality of a state statute prohibiting such distribution.  *Id.* at 458–60. As then-Justice Rehnquist put it in his concurrence, "the declaratory judgment procedure is an alternative to pursuit of the arguably illegal activity."  *Id.* at 480. In each of these cases, the plaintiff had eliminated the imminent threat of harm by simply not doing what he claimed the right to do (enter into a lease, or distribute handbills at the shopping center).  That did not preclude subject-matter jurisdiction because the threat-eliminating behavior was effectively coerced. *See Terrace*, 263 U.S. at 215–16; *Steffel*, 415 U.S. at 459.

*Id.* at 129 (citations altered).  Notably, this rule applies with particular force in the First Amendment context, where threats of enforcement actions can suppress protected speech, thereby causing the plaintiff immediate injury.  As a result, standing to challenge government action "burdening expressive rights requires only a credible statement by the plaintiff of intent to commit violative acts and a conventional background expectation that the government will enforce the law."  *U.S. Telecom Ass'n v. FCC*, 825 F.3d 674, 739 (D.C. Cir. 2016) (citation modified).

Here, Plaintiff has attested, and there is no reason to doubt, that it "wishes to again display these signs as part of its permitted demonstration, but reasonably fears that if it does so its permit will be summarily revoked and/or its demonstration forcibly broken up."  Dkt. 8-1 at 4 (Carey Decl. ¶ 11).  It "intends to display these signs again as soon as it receives legal protection from those consequences."  *Id.* (Carey Decl. ¶ 12).  Plaintiff has thus established that it intends "to engage in a course of conduct arguably affected with [the] constitutional interest," of its political speech.  *Susan B. Anthony List*, 573 U.S. at 159 (citation modified).

The threat of enforcement is also far more than "credible."  *Id.*  The Secret Service has twice visited Plaintiff's demonstration, Dkt. 15 at 2–3, has given *Miranda* warning to one of Plaintiff's volunteers, *id.* at 3, and has opened a criminal investigation, Dkt. 13-1 at 4 (Quinn

Decl. ¶ 10).  The Secret Service's investigation, in turn, prompted the NPS to act by, among other things, sending four cars of Park Police officers to Plaintiff's demonstration site to inform one of Plaintiff's volunteers that he or she was violating the criminal law by making a threat against the President and asking him or her to remove the flag.  *See* Dkt. 10-2 at 1 (2d Carey Decl. ¶ 2); Dkt. 16 at 1–2.  And separately, multiple representatives of the NPS have also visited Plaintiff's demonstration site, Dkt. 31-2 at 1–3 (Sheffer Decl. ¶¶ 3–4, 7, 10), and informed Plaintiff that two of its signs have "been evaluated under all appropriate standards and tests and [have been] deemed unprotected obscenity," which is not allowed on federal property and which violates the terms of Plaintiff's permit.  Dkt. 8-1 at 3 (Carey Decl. ¶ 7).[1]

Although Plaintiff seeks only to enjoin the revocation of its permit and the confiscation or destruction of its displays—and not to enjoin any ongoing criminal investigation or proceeding— there is ample evidence that the Secret Service and the NPS are focused on the specific signs and flag at issue; that they have already concluded that these displays are unlawful, unprotected, and incompatible with Plaintiff's demonstration permit; and that, if Plaintiff were to continue to display them without a Court order, it would face enforcement actions, including the prompt loss of its permit.  Given the unique attention that the Secret Service and NPS has given to Plaintiff's purportedly unlawful and dangerous activity, it is unsurprising that Defendants have declined to "disavow any intention" of taking further action against Plaintiff on account of its displays. *Woodhull Freedom Found. v. United States*, 948 F.3d 363, 373 (D.C. Cir. 2020).  In short, this is not a case in which a plaintiff that may or may not face an enforcement action seeks to challenge

---

[1] All of this must be assessed, moreover, against the backdrop of Defendants' previous revocation of the demonstration permit and dismantlement of the demonstrations of its partner organization, For Liberation and Resistance Everywhere USA (FLARE), on two separate occasions.  *See* Dkt. 8-1 at 4 (Carey Decl. ¶ 9).

a statute or regulation of general applicability.  Plaintiff, instead, seeks relief with respect to all-but-certain government action that is directed exclusively at it and that shows no hint of relenting.

Nor is it an answer to suggest that Plaintiff could simply wait for the NPS to revoke its permit and then bring suit.  Plaintiff needs its permit to continue its demonstration, and even a brief revocation of that permit—and the possible dismantling and removal of its demonstration site—would cause Plaintiff irreparable First Amendment injury.  Moreover, in light of the fact that Defendants have not only sought to deter the future exercise of First Amendment rights but have already "direct[ly] prohibit[ed] . . . the exercise of First Amendment rights[,]" *Laird*, 408 U.S. at 11, nothing more is required from Plaintiff to establish a First Amendment injury-in-fact, *Media Matters for Am. v. Paxton*, 138 F.4th 563, 585 (D.C. Cir. 2025) (to obtain injunctive relief, "a party must show that their First Amendment interests are either threatened or in fact being impaired at the time relief is sought." (citation modified)); *cf. Woodhull Freedom Found.*, 948 F.3d at 371 ("lower courts' willingness to permit pre-enforcement review is at its peak when claims are rooted in the First Amendment," (citation modified)).

The elements of causation and redressability are also straightforward: they "typically overlap as two sides of a causation coin" because "if a government action causes an injury, enjoining the action usually will redress that injury." *Carpenters Indus. Council v. Zinke*, 854 F.3d 1, 6 n.1 (D.C. Cir. 2017) (citation modified).  That is the case here.  Plaintiff's First Amendment injuries are "fairly traceable,"—in fact, only traceable—to Defendants' actions, and an order enjoining Defendants from further interference with Plaintiff's First Amendment rights would restore Plaintiff's freedom to display its signs and flags and to engage in the speech at issue.

17

The Court, accordingly, is satisfied that Plaintiff has Article III standing to bring its First Amendment challenge.

## B.       Merits

At the onset, the Court notes that significant disagreement emerged at oral argument regarding two related issues: (1) whether the Court's review was limited to the agency's record or whether the Court should engage in independent fact finding, and (2) whether and how the agency's rationale might evolve over time. *See* June 23, 2026 Hrg. Tr. (Rough at 4–5, 13–14, 19–26, 31–34). Plaintiff's counsel argued that "the relevant factual context . . . was what was before the agency when it made this decision" and the Court should consider only the rationale offered by the agency officials at the time. *Id.* (Rough at 4–5, 44). Defendants' counsel conceded that the Court "should not consider rationales that were developed for purposes of litigation" but still maintained that "the record in this case . . . is evolving because this is an ongoing dispute" and that this case should not be treated "like a traditional APA-style case" for at least two reasons. *Id.* (Rough at 13). First, if the Court concludes that the speech is not protected under the First Amendment, the agency action would need to pass only "rational basis review," which is not limited to the "contemporaneous statements by the government." *Id.* (Rough at 13–14). Second, new or different threats or relevant context might emerge over time, and the agency's hands should not be tied in addressing future threats. *Id.* (Rough at 31–33).

There are grains of truth to both positions. Defendants are correct that Plaintiff has not brought suit under the Administrative Procedure Act and that the Court is not bound to an administrative record compiled by the agency in evaluating an agency rule or adjudication. Defendants are also correct that their enforcement authority is not frozen in time and that new circumstances may invite new consideration and, if consistent with this opinion and the law, new actions. Plaintiff, in turn, is correct that the question before the Court is whether the NPS acted

lawfully in declaring the displays unlawful, asking Plaintiff to remove them, and threatening to revoke Plaintiff's permit if it failed to do so.  And, in considering the lawfulness of that action, the agency's factual and legal predicate matters.  As the Supreme Court has observed: "Government justifications for interfering with First Amendment rights must be genuine, not hypothesized or invented *post hoc* in response to litigation." *Kennedy v. Bremerton Sch. Dist.*, 597 U.S. 507, 543 n.8 (2022) (citation modified).  The government cannot invent new compelling interests which it failed to "raise . . . in its contemporaneous correspondence" with the speaker to justify its censorship of protected speech. *Id.*

At least in the present context, however, little turns on this conceptual debate between the parties.  First, Defendants argue that, if the speech at issue is not protected by the First Amendment, they need only satisfy rational basis scrutiny and should be free to rely on any and all plausible rationales for their action.  But for the reasons explained below, the Court concludes that Plaintiff's speech is fully protected, and, thus, the question of rational basis scrutiny never arises.  Second, the parties debate whether the case is governed by the administrative record.  But there is no dispute about the relevant facts, and those facts have not shifted in any material respects since the agency acted.  Third, although the record suggests that Defendants' contention that the rape signs are obscene as to minors is a *post hoc* rationale introduced for the first time in litigation, June 23, 2026 Hrg. Tr. (Rough at 15–17), the Court nonetheless addresses that rationale and, for the reasons explained below, concludes that the signs are neither obscene under the traditional *Miller* test nor as to minors under the modified version of that test.  Because Defendants' restriction on Plaintiff's speech cannot survive strict scrutiny either way, the evolution in Defendants' thinking is ultimately immaterial.

The Court, accordingly, turns to the specific displays at issue.

19

1.      *Sexual Misconduct Signs*

The Court begins with the two signs accusing President Trump of rape: one that reads "TRUMP RAPED LITTLE GIRLS." and the other that reads "KIDS, IF YOUR PARENTS ARE MAGA, THEY LOVE CHILD RAPISTS."  Dkt. 8-1 at 2 (Carey Decl. ¶ 4).

As a threshold matter, Plaintiff contends that "Defendants have identified no law that Plaintiff would violate by displaying its signs."  Dkt. 34 at 8–9.  According to Plaintiff, because Griess's email invoked "federal law which prohibits obscene material on federal property," Dkt. 8-1 at 3 (Carey Decl. ¶ 7), Defendants may not prohibit Plaintiff's signs "if there is no law prohibiting" their display, Dkt. 34 at 9.  Plaintiff asserts that its signs do not violate any of the identified federal obscenity laws, whether that be 36 C.F.R. § 2.34(a)(2) or D.C. Code § 22-2201(b)(1)(A)(ii), and accordingly, that Defendants lack the authority to regulate Plaintiff's signs. *See id.* at 9–10.  Defendants, in turn, contend that Plaintiff has forfeited this argument because it appears for the first time in Plaintiff's reply.  Dkt. 36 at 3–4.  But it was Defendants' *response* to Plaintiff's motion that raised, for the first time, the purportedly applicable "federal law[s] which prohibit[] obscene material on federal property" that Griess may have been referring to in his email, Dkt. 8-1 at 3 (Carey Decl. ¶ 7).  *See* Dkt. 31 at 9 (citing 36 C.F.R. § 2.34(a)(2) and D.C. Code §§ 22-1321, 22-2201 as "applicable laws" that the NPS enforces).  Plaintiff cannot, accordingly, be blamed for addressing these materials in its reply.

Defendants are correct, however, that "Plaintiff's lack-of-authority argument is not necessary to resolve [its] claim with respect to the signs."  Dkt. 36 at 4.  Even more to the point, Plaintiff asserts only a First Amendment challenge to the agency's action, Dkt. 9 at 7 (Am. Compl. ¶¶ 25–26), and thus Defendants' lack of regulatory authority is, at most, indirectly at issue.  The Court, accordingly, agrees that it "need only consider whether the speech is categorically unprotected and then apply the appropriate constitutional standard."  Dkt. 36 at 4.

20

The Court pauses only briefly to consider whether the speech at issue is, as Griess wrote in his email, obscene and thus "not within the area of constitutionally protected speech or press," *Roth v. United States*, 354 U.S. 476, 485 (1957).  Under the well-known standard articulated in *Miller v. California*, 413 U.S. 15 (1973), speech is obscene if (1) "the average person, applying contemporary community standards would find that the work, taken as a whole, appeals to the prurient interest," (2) "the work depicts or describes, in a patently offensive way, sexual conduct specifically defined by the applicable state [or federal] law," and "the work, taken as a whole, lacks serious literary, artistic, political, or scientific value," *id.* at 24 (citation modified); *see also Free Speech Coal., Inc. v. Paxton*, 606 U.S. 461, 472–73 (2025) (same).  "[A]ll three prongs of the *Miller* test must be satisfied for a work to be found obscene."  *United States v. Various Articles of Merchandise, Schedule No. 287*, 230 F.3d 649, 652 (3d Cir. 2000); *see also United States v. Various Articles of Obscene Merchandise, Schedule No. 2102*, 709 F.2d 132, 135 (2d Cir. 1983); *United States v. Ragsdale*, 426 F.3d 765, 771 (5th Cir. 2005).

Understandably, Defendants have now conceded that the two signs at issue are not obscene as to adults.  *See* June 23, 2026 Hrg. Tr. (Rough at 14–15, 26–27) ("I would agree with you that the second sign," which omits the introductory reference to "KIDS," "would be neither obscene nor obscene as to minors").  Indeed, to argue otherwise would be to suggest that virtually every news outlet in the country violates the obscenity laws every time it refers to allegations of rape or rape of a minor.  Nor can one plausibly maintain that the First Amendment affords no protection to those who accuse high ranking government officials of having committed sex crimes, including the rape of a child.  Allegations of rape, standing alone, do not appeal to any prurient or unwholesome interest in nudity, sex, or excretion; they do not describe sexual conduct in a patently offensive way, and, indeed, do not describe a particular sex act at

all; and they do not lack all serious political value.  To the contrary, "'[o]bscene antigovernment' speech, . . . is a contradiction in terms:  If expression is antigovernment, it does not lac[k] serious . . . political . . . value' and cannot be obscene." *R.A.V. v. City of St. Paul*, 505 U.S. 377, 418 (1992) (Stevens, J., concurring in the judgment).

Recognizing the futility of arguing otherwise, Defendants do not argue that the two rape signs are obscene in general, but, rather, only obscene as to minors.  Because "States have a specific interest in protecting *children* from sexually explicit speech," the government "may prevent children from accessing speech that is obscene to children," in a manner subject only to rational basis review "even though [that speech may] encompass speech that is 'not obscene for adults.'" *Free Speech Coal., Inc.*, 606 U.S. at 472, 474 (emphasis in original) (second quoting *Ginsberg v. New York*, 390 U.S. 629, 634 (1968)).  "When regulating minors' access to sexual content, the State may broaden *Miller*'s definition of obscenity to cover that which is obscene from a child's perspective," *Id.* at 474 (citation modified).  Accordingly, "a State may prevent minors from accessing works that (a) taken as a whole, and under contemporary community standards, appeal to the prurient interest *of minors*; (b) depict or describe specifically defined sexual conduct in a way that is patently offensive *for minors*; and (c) taken as a whole, lack serious literary, artistic, political, or scientific value *for minors*." *Id.* (emphases in original). And although the restriction on children's access to such material is subject only to rational basis review, "[t]o the extent that [the restriction] burdens adults' rights to access such speech" incidentally, the restriction is "subject to intermediate scrutiny." *Id.* at 478.

Here, it is far from clear that either of the signs at issue is properly evaluated under the obscene-as-to-minors standard.  Defendants hang their entire argument on the fact that one of the two signs opens with the salutation, "KIDS," Dkt. 31 at 18, before stating "IF YOUR PARENTS

22

ARE MAGA, THEY LOVE CHILD RAPISTS[,]" Dkt. 8-1 at 2 (Carey Decl. ¶ 4).  The other

sign at issue omits any such salutation and merely asserts: "TRUMP RAPED LITTLE GIRLS."

*Id.*  As to that sign, counsel for the government conceded at oral argument that "viewed in

isolation, . . . the second sign would be neither obscene nor obscene as to minors" but urged the

Court to "view these signs as . . . one integrated message," the second of which merely

"elaborate[d] on the other."  June 23, 2026 Hrg. Tr. (Rough at 27).  Although Defendants

acknowledge that "incidental viewers from a particularly vulnerable class—like children—do not

wield a veto over speech that is suitable for the public at large," they maintain that this case is

different because "Accountability Now's speech, on its own terms, was not directed to the public

at large—it was directed at and tailored to 'KIDS.'"  Dkt. 31 at 18.

That characterization of the speech is a stretch.  As Carey explains in her uncontroverted

declaration, the message is far broader than Defendants contend.  It is clearly "directed at all the

people who visit [the] demonstration," and it invites parents to "think about what lessons their

children are learning if they see their parents" supporting the President.  Dkt. 33-1 at 2 (6th

Carey Decl. ¶ 4).  Notably, the sign was displayed as part of a demonstration calling for

President Trump's impeachment and removal from office, and the demonstration is located on a

busy street in front of a federal courthouse.  *See* Dkt. 8-1 at 1 (Carey Decl. ¶¶ 1–2).  The

demonstration is not at or near a school or playground, where children are often unaccompanied

by their parents.  Nor were the signs included in children's television programing or online or at

a place that young children can often access without their parents' knowledge.  Although

children "sometimes visit [the] demonstration site," Dkt. 33-1 at 2 (6th Carey Decl. ¶ 4), the

government offers no evidence that it considered whether or how often children might see the

sign before acting—or, indeed, that it was aware that a single child had seen the signs, *see* June 23, 2026 Hrg. Tr. (Rough at 20).

Defendants' regulation of these publicly visible signs, moreover, is a far cry from the sorts of regulations targeting the direct distribution of sexual content to minors at issue in *Ginsberg*, *Reno v. ACLU*, 521 U.S. 844 (1997), *Ashcroft v. ACLU*, 542 U.S. 656 (2004), and *Free Speech Coalition*. The Court is, therefore, unpersuaded that Defendants' actions are reasonably characterized as the direct regulation of "sexual material harmful to minors" that has "only an incidental effect on" "adults' rights to access such speech." *Free Speech Coal.*, 606 U.S. at 467, 478. To the contrary, before they were removed at the direction of the NPS, the signs appeared as part of a months-long demonstration in front of the courthouse and in the shadow of the U.S. Capitol, seeking the impeachment and removal of the President. Suppression of the speech had far more than "an incidental effect on" the adult population. *Id.* at 478.

But even putting that threshold difficulty aside, Defendants' contention that the two signs are obscene as to minors fails for multiple reasons:

*First*, the signs, "taken as a whole, and under contemporary community standards," do not "appeal to the prurient interest *of minors*." *Id.* at 474 (emphasis in original). "[P]rurient interest[s]" are "shameful or morbid interest[s] in nudity, sex, or excretion." *Roth*, 354 U.S. at 487 n.20 (citation modified). In *Miller*, the Supreme Court clarified that the relevant "community standards" need not be the "national standard[s]" but can reflect the values of the local community. 413 U.S. at 32–33 (citation modified). Here, Defendants maintain that this factor is satisfied because Plaintiff's signs "predominantly invoke[] in minors a 'shameful or morbid interest' in violent and unlawful sex," and "piques minors' 'shameful and morbid interest' in a particularly repugnant and criminal category of sex." Dkt. 31 at 19–20.

24

Their argument borders on the absurd.  Accusations of rape—and, in particular, rape of a child—are undoubtedly disturbing.  But they do not pique a shameful or morbid interest in that repugnant and criminal act.  Here, moreover, Plaintiff's signs unequivocally condemn "child rapists" or those who "raped little girls."  Dkt. 8-1 at 2 (Carey Decl. ¶ 4) (capitalization altered).  They do not, by any stretch of the imagination, "deal[] with sex in a manner appealing" to minors' shameful interest in child rape or pedophilia.  *Roth*, 354 U.S. at 487.  To be sure, rape involves sexual contact of some form.  But that is the extent of it, and "[s]ex and obscenity, . . . as the Supreme Court has held, are not synonymous."  *Freedberg v. U.S. Dep't of Just.*, 703 F. Supp. 107, 109 n.3 (D.D.C. 1988) (citing *Roth*, 354 U.S. at 487).

*Second*, Plaintiff's signs do not "depict or describe specifically defined sexual conduct in a way that is patently offensive *for minors*."  *Free Speech Coal.*, 606 U.S. at 474 (emphasis in original).  Patently offensive materials "go[] substantially beyond customary limits of candor and affront[] contemporary community standards of decency."  *Miller*, 413 U.S. at 31 (citation modified).  As with prurient appeal, patent offensiveness may be measured by the standard that prevails in the state or forum community.  *See id.* at 32–33.  Defendants' claims with regard to this factor are even further afield.  They contend that the signs "accost[] children with a graphic description of violent sexual crimes" and "explicitly refer to a sexual act and use the term 'RAPE' in its ordinary criminal sexual sense."  Dkt. 31 at 21, 23.  Neither sign, however, includes any description of the alleged sexual crimes, much less a "graphic" one.  *See* Dkt. 8-1 at 2 (Carey Decl. ¶ 4).  Indeed, neither sign "depicts or describes" any sexual contact at all, beyond conveying that it was non-consensual (perhaps due to force, or perhaps due to the age of the alleged victims) and that the victims were minors.  By Defendants' logic, *To Kill a Mockingbird*, *The Color Purple*, *A Tree Grows in Brooklyn*, *Tess of the d'Urbervilles*, *Leda and the Swan*, *The*

25

*Rape of the Sabine Women*, and the biblical story of Dinah and Shechem (Genesis 34) would all fail this prong of the obscene-as-to-minors test.  That, of course, is not the law.

*Finally*, Defendants do not—and cannot—show that the two signs lack any "serious . . . political . . . value" for minors.  *Miller*, 413 U.S. at 24.  The signs constitute a direct response to current events: news reporting that "the Justice Department was withholding more than 50 pages of FBI interviews with a woman who had accused Donald Trump of sexually abusing her when she was a minor."  Dkt. 8-1 at 2 (Carey Decl. ¶ 4).  The signs "ha[ve] engendered numerous conversations between volunteers and passersby regarding President Trump's [alleged] behavior, morality, and fitness to continue in office," *id.*, topics that are plainly a "matter[] of political concern," *Elrod v. Burns*, 427 U.S. 347, 372 (1976).  Although Defendants maintain that the signs "frustrate [healthy political discussion] by explicitly accusing many parents of loving child rapists," Dkt. 31 at 24 (cleaned up), it is neither the government's nor the Court's role to distinguish healthy from unhealthy debate and discussion of topics of national importance.  The same is true of Defendants' contention that because the signs fail to "explain that they are mere rhetoric or innuendo," minors will not "understand their veiled meaning, related conspiracy theories, or the broader political context to which the signs vaguely allude."  *Id.* at 24.  In pressing this argument, Defendants concede that the signs constitute political discourse, and they appear to acknowledge that the signs were not, in fact, targeted at children—a contention at odds with their vehement assertion that children are "the target audience" of these signs.  *Id.* at 21.  But most problematically, Defendants incorrectly suggest that the NPS may exercise its permitting authority to police the content of speech and to ensure that it is not misleading—at least as to minors.  Emphatically, that is not the role of the government or the Court.

Along similar lines, Defendants characterize the signs as raising sexual misconduct allegations that are "frivolous[]" and that propagate "conspiracy theories."  Dkt. 31 at 24.  But if anything, those assertions undermine the government's defense; the government lacks authority to regulate the content of political speech, particularly political speech that is critical of the government or senior government officials, based on the belief that the speaker has it wrong.  As Justice Holmes observed in his famous dissent in *Abrams v. United States*:  "[W]hen men have realized that time has upset many fighting faiths, they may come to believe even more than they believe the very foundations of their own conduct that the ultimate good desired is better reached by free trade in ideas—that the best test of truth is the power of the thought to get itself accepted in the competition of the market."  250 U.S. 616, 631 (1919) (Holmes, J., dissenting).  That is true in general, and it is particularly true in the context of "[t]he sort of robust political debate encouraged by the First Amendment," which "is bound to produce speech that is critical of those who hold public office."  *Hustler Magazine, Inc. v. Falwell*, 485 U.S. 46, 51 (1988).  "Such criticism, inevitably, will not always be reasoned or moderate," but unless that criticism crosses the line into the realm of unprotected speech, the answer inevitably lies in more, rather than, less speech.[2]  *Id.*

For all of these reasons, the Court concludes that Plaintiff's signs are protected speech, not obscene as to minors.  As such, any effort to preclude Plaintiff from engaging in this speech in a public forum is subject to strict scrutiny, and Defendants fail to satisfy that demanding standard.  *See* Dkt. 31 at 25–28.  As a preliminary matter, Defendants do not have a compelling interest in "shielding children" from any public reference to rape or sexual contact that is not

---

[2]  Defendants do not contend that the speech at issue is libelous under the actual malice standard applicable to public figures, *see New York Times Co. v. Sullivan*, 376 U.S. 254 (1964), nor would the NPS have authority to take an enforcement action based on such a theory.

obscene as to minors, and, for the reasons explained above, Defendants have failed to demonstrate that Plaintiff's speech meets that standard, *id.* at 27 ("The majority is right that a State has a compelling interest in shielding children *from the obscene-for-children materials* that [the Texas statute] covers." (emphasis added) (quoting *Free Speech Coal.*, 606 U.S. at 509 (Kagan, J., dissenting)).

But even if it had, Defendants' attempt at narrow tailoring fails outright.  Although government counsel relies principally, if not exclusively, on the fact that one of the signs uses the salutation "KIDS" to argue that the speech is directed at children, *see* Dkt. 31 at 18, there is no evidence that Defendants ever requested—or even suggested—that Plaintiff remove that word from the sign.  Similarly, although counsel for the government concedes that Plaintiff's second sign is neither obscene as to adults nor children, *see* June 23, 2026 Hrg. Tr. (Rough at 27), and that Defendants' only defense with respect to the second sign is that it formed an integrated message with the sign that referred to "KIDS" when placed alongside it, *id.*, Defendants offer no explanation for why they required Plaintiff to remove both signs.  If the second sign was offending only because it appeared along with the first, one would think that removal of the first sign would resolve any question about whether the second sign targeted children.  Indeed, if anything, the uncontroverted evidence documents only two occasions when children visited the demonstration, and it says nothing about whether the allegedly offending signs were on display on either occasion.  Dkt. 33-1 at 2–3 (6th Carey Decl. ¶ 4).  Far more than this scant record is required to suppress speech that is admittedly fully protected as to the adults that frequent the site.  To borrow Justice Frankfurter's colorful analogy, Defendants' attempt to suppress Plaintiff's core political speech based on the possibility that young children (presumably unaccompanied by an adult) might see the signs is not only unsupported by the evidence but is

28

also akin to "burn[ing] the house to roast the pig." *Butler v. Michigan*, 352 U.S. 380, 383 (1957).

The Court, accordingly, concludes that Defendants' conduct violates Plaintiff's First Amendment rights with respect to the two signs at issue and will grant summary judgment in Plaintiff's favor with respect to its First Amendment claim challenging the NPS's direction that it remove the two signs under threat of revocation of its permit.

  2.  *8647 Flag*

As noted above, in resolving Plaintiff's motion for a TRO, the Court concluded that Plaintiff was likely to prevail on the question whether its "8647" flag is protected political speech, rather than a true threat to the President's physical well-being. Dkt. 20. With two limited exceptions, the parties have not engaged in any further factual development and have not submitted any further evidence regarding the all-important context surrounding Plaintiff's display of that flag. *See, e.g.*, Dkt. 31 at 28 (response in opposition to the renewed motion for a preliminary injunction incorporating by reference Defendants' prior arguments regarding the "8647" flag). The Court, accordingly, reprises much of its analysis—albeit with minor alterations—from its prior opinion below. For all the reasons set forth in that prior decision, *see* Dkts. 20, 21, & 29, and as explained further below, the Court concludes that, in displaying the flag, Plaintiff neither made a "true threat" to the President's safety nor incited imminent violence and that, accordingly, Plaintiff is entitled to prevail as a matter of law on its First Amendment challenge to the threatened revocation of its demonstration permit or removal of its "8647" flag.

As the Court explained in its prior decision, all agree that "[t]rue threats of violence," like criminal incitement, are not protected by the First Amendment, *Counterman v. Colorado*, 600 U.S. 66, 72 (2023), and "may [be] prohibit[ed] . . . without raising any Constitutional problem," *Free Speech Coal., Inc.*, 606 U.S. at 471 (citation modified). The parties also agree that "context

29

is dispositive" and that "[n]ot every use of the slang phrase '86' constitutes a threat of violence," as opposed to connoting the phrase's more common meaning "that someone or something should be removed, ejected, or thrown out." Dkt. 20 at 9. The parties' disagreement, instead, turns on which of these two meanings objectively characterizes Plaintiff's display of the flag in the context in which it was displayed.

a.   True Threats

"True threats of violence, everyone agrees, lie outside the bounds of the First Amendment's protection." *Counterman*, 600 U.S. at 72. "'True threats' encompass those statements where the speaker means to communicate a serious expression of an intent to commit an act of unlawful violence to a particular individual or group of individuals." *Virginia v. Black*, 538 U.S. 343, 359 (2003). "The 'true' in that term distinguishes what is at issue from jests, 'hyperbole,' or other statements that when taken in context do not convey a real possibility that violence will follow." *Counterman*, 600 U.S. at 74 (citing *Watts v. United States*, 394 U.S. 705, 708 (1969) (per curiam)). "The existence of a threat depends not on 'the mental state of the author,' but on 'what the statement conveys' to the person on the other end." *Id.* (quoting *Elonis v. United States*, 575 U.S. 723, 733 (2015)); *see also United States v. Syring*, 522 F. Supp. 2d 125, 129 (D.D.C. 2007) ("Courts determining whether communications constitute true threats have generally applied an objective standard[,]" assessing "whether a reasonable person would consider the statement a serious expression of an intent to inflict harm[.]" (citation modified) (first citing *Planned Parenthood of Columbia/Willamette, Inc. v. Am. Coal. of Life Activists*, 290 F.3d 1058, 1075 n.7 (9th Cir. 2002)). Alleged threats "must be analyzed 'in light of their entire factual context,' . . . including: the reaction of the recipient of the threat and of other listeners; whether the threat was conditional; whether the threat was communicated directly to its victim; whether the maker of the threat had made similar statements to the victim in the past; and

30

whether the victim had reason to believe the maker of the threat had a propensity to engage in violence." *Syring*, 522 F. Supp. 2d at 130 (citation modified) (quoting *United States v. Dinwiddie*, 76 F.3d 913, 925 (8th Cir. 1996)).

As the Court explained in its prior decision, *Counterman* raised a question whether, in addition to this objective standard, a subjective standard—that is, a requirement that the speaker at least "consciously disregard[] a substantial and unjustifiable risk that the conduct will cause harm to another," *Counterman*, 600 U.S. at 79 (citation modified)—applies to civil regulatory conduct, such as the threatened revocation of Plaintiff's demonstration permit. *See generally* Dkt. 20 at 10–11. The Court noted that, particularly because "the Secret Service officer read the volunteer her *Miranda* rights, Dkt. 15 at 3, and the Park Police officer subsequently invoked the federal statute criminalizing threats against the President in directing Plaintiff to remove the flag, Dkt. 10-2 at 1 (2d Carey Decl. ¶ 2), . . . it seems likely that the NPS's action can be sustain[ed] only if the speech at issue satisfies both the objective and subjective criteria for a true threat." *See id.* at 11.

To the extent that Plaintiff had to display the flag as a "knowing[] and willful[]" threat to the President's life before the NPS could request the flag's removal and threaten further sanctions, 18 U.S.C. § 871(a), the uncontroverted evidence demonstrates that Plaintiff lacked any subjective intent to threaten or to harm the President and that it merely sought to use the flag to communicate that "Trump shouldn't be in office," Dkt. 15 at 2. Because the premise is uncontroverted, Plaintiff would likely be entitled to judgment as a matter of law on that basis alone. But because the parties have not briefed the issue, *see* Dkt. 27 at 27 n.26, and because the Court remains convinced that no reasonable person, aware of the relevant circumstances, would regard the flag to represent "a serious expression of an intent to commit an act of unlawful

31

violence to" the President, *Black*, 538 U.S. at 359, the Court need not—and does not—base its decision on that ground alone.  Instead, the Court, once again, relies on the objective prong of the true-threat test and concludes that, under that prong, Plaintiff is entitled to prevail.

In considering how a reasonable person would understand Plaintiff's display of the flag, the Court starts with the premise that the word "86" is a slang term with no single meaning. According to Merriam-Webster, "Eighty-six is slang meaning 'to throw out,' 'to get rid of,' or 'to refuse service to.'"  *What does 'eighty-six' mean?*, Merriam-Webster, https://perma.cc/3KZD-9LXL.  The phrase "comes from 1930s soda-counter slang meaning that an item was sold out[,]" and may have been used because it rhymes with "nix."  *Id.*  It was first used as a noun to refer "to an item . . . that had been sold out," but by the 1950s, the term was used as a verb, at first meaning "'to refuse to serve a customer,'" later coming to meaning "'to get rid of; to throw out,'" and still later coming to mean "'shut out' or 'rejected.'"  *Id.*  Merriam-Webster further notes that a recent extension of these meanings has included "'to kill'" as "a logical extension of" those prior meanings, although the dictionary declines to endorse that meaning "due to its relative recency and sparseness of use."  *Id.*  According to Merriam-Webster, "[t]he most common meaning of *eighty-six* encountered today is the one that is closer to its service industry roots."  *Id.*

Plaintiff attests that its display of the flag was "not in any way a threat against the President" but, rather, was part of months-long demonstrations demanding "the impeachment and removal of President Trump."  Dkt. 10-2 at 2 (2d Carey Decl. ¶ 6).  Although Defendants offer no evidence or explanation regarding how (and why) the NPS understood Plaintiff's specific use of the term, the Deputy Director of the Secret Service attests that he *generally* "regard[s] the statement '86-47' as a potential call for acts of violence directed at the President of

the United States" and that he "understand[s] '86' to represent a euphemism for acts of physical violence." Dkt. 13-1 at 3 (Quinn Decl. ¶ 8). But neither the Deputy Director's understandable vigilance nor the mere possibility—or "potential"—that the term might be used as a call for violence suffices for purposes of the First Amendment. In this respect, the parties' characterizations of the speech are less far apart than they might at first seem: Plaintiff represents that it did not intend to convey a threat of violence and posits that no reasonable observer would conclude otherwise, while Defendants maintain that "86" can at times mean "to kill," although they concede that that is not the only meaning of the term. Although the Court recognizes the importance and difficulty of the mission of the Secret Service, the First Amendment does not permit the government to censor political speech merely because the speaker uses a phrase that, in addition to other more common meanings, can at times refer to an act of violence. Indeed, that Defendants were once willing to go as far as suggesting that references to "remove" in Plaintiff's signs referring to "impeach" and "remove" were ambiguous and could mean "to kill," *see* May 28, 2026 Hrg. Tr. (Rough at 25), demonstrates the far-reaching and acontextual nature of Defendants' arguments. What matters is how the term is used in the specific context at hand, and here the word "86" carries no more inherently sinister meaning than the word "remove." Just as the Constitution does not use the word "remove[]" to mean to kill, *see* U.S. Const. art. II, § 4, when viewed in context, Plaintiff did not use that word or the phrase "86" to mean to kill.

This is all to say that the question whether "8647" constitutes a true threat cannot be resolved in the abstract, without consideration of context, and, here, the relevant context makes clear that no reasonable observer could have viewed Plaintiff's display of the flag as a threat to the President's life or physical safety. To start, the flag itself contains no symbols of violence; it

33

is red, white, and blue, and is simply adorned with white stars.  It contains no knives, skulls, nooses, or other threatening symbols.  Dkt. 10-2 at 1–2 (2d Carey Decl. ¶ 3).  Even more to the point, the flag was displayed outside the courthouse, as part of an ongoing demonstration seeking President Trump's impeachment and removal from office.  *Id.* at 2 (2d Carey Decl. ¶ 6).  In a video submitted by Plaintiff, the flag can be seen hanging from one side of Plaintiff's tent, surrounded by not one, but four signs that read "IMPEACH. CONVICT. REMOVE."  Dkt. 19.  Yet another sign merely reads: "IMPEACH."  *Id.*  In short, the surrounding signage urged Congress "to throw out" the President.

Nor is there any evidence that Plaintiff or the volunteers who staffed the demonstration engaged in any threatening speech or conduct.  *See Syring*, 522 F. Supp. 2d at 130 (considering "whether the victim had reason to believe the maker of the threat had a propensity to engage in violence" as part of objective assessment).  Notably, when the officer informed the volunteer who was displaying the flag that the Secret Service had "received a phone call because of the flag . . . and what it can stand for," the volunteer seemed genuinely stunned and responded:  "I never heard of it standing for anything other than Trump shouldn't be in office."  Dkt. 15 at 2.  When the officer continued, "[s]o you have no ill-will towards" the President, the volunteer said, "I want Trump to live forever," adding that she also wanted him to "rot in jail."  *Id.*  Given this response, the officer left without taking any further action and, instead, reassured the volunteer that he wanted "to make sure that [her] First Amendment rights are protected" and that "there's no ill-will."  *Id.*

Under these circumstances, it is difficult to fathom how any reasonable observer, much less the NPS (or the Secret Service), which had the benefit of a personal conversation about the flag with Plaintiff's volunteer, would view the flag as a true threat.  The term "86" is used far

34

more often to mean to "throw out" than to "kill," and it appeared at a demonstration that was focused, of all things, on the constitutional impeachment and "removal" of the President—that is, to throwing the President out of office. Dkt. 10-2 at 2 (2d Carey Decl. ¶ 6); *see also* Dkt. 19. And, for safe measure, the volunteer informed the Secret Service that the flag merely sought President Trump's removal from office. Dkt. 15 at 2.

At oral argument on the motion for a TRO, counsel for the government conceded that (1) the inquiry about whether particular speech constitutes a true threat is context-dependent; (2) there are circumstances in which the term "8647" does not represent a true threat to the President, May 28, 2026 Hrg. Tr. (Rough at 15–16); and (3) the Defendants are "not going to prosecute or go after everybody with an 8647 flag," *id.* (Rough at 19). But when asked how, then, did Defendants conclude that Plaintiff's specific invocation of "8647" constituted a true threat, *id.* (Rough at 16–18, 20–22, 29), counsel for the government retreated, repeatedly asserting that the use of the term in the context of unprecedented and recent assassination attempts against the President constitutes a true threat, *id.* (Rough at 16–17, 22, 27, 29, 40). When asked whether the agency engaged in any case-specific fact-finding or undertook any analysis of whether Plaintiff's usage of "8647" in the context of its ongoing demonstration violated 18 U.S.C. § 871, Defendants' counsel demurred, noting that he either did not know or that there was nothing in the record before the Court. *Id.* (Rough at 29–30, 34, 36, 38).

Given the centrality of this type of context-specific inquiry, and the absence of any evidence that the NPS ever considered the context in which the flag was displayed, the Court invited Defendants to supplement the record with any evidence or material explaining the NPS's thinking. *Id.* (Rough at 38, 43). In inviting the Defendants to supplement the record with its contemporaneous decision-making, the Court sought information relevant to understanding how

any reasonable observer could have concluded that Plaintiff's display of the flag in the context in which it was displayed constituted a true threat, whether there was more to that context than what was submitted by Plaintiff, and what government interest may have motivated or justified Defendants' request. Even more importantly, in opposing Plaintiff's motion for a preliminary injunction, which the Court now treats as a motion for summary judgment, Defendants have had ample opportunity to explain how a reasonable observer could have possibly viewed the display of the "8647" flag, in context, as a true threat to President Trump's well-being.

In responding to the Court's invitation to supplement the TRO record, Defendants failed to offer any analysis or consideration of the specific context surrounding Plaintiff's display of the flag that would inform the views of a reasonable observer. Instead, they simply repeated Deputy Director of the Secret Service Matthew Quinn's averment that he regards "the statement '86-47' as a potential call for acts of violence directed at the President," Dkt. 16 at 1 (citation modified) (quoting Dkt. 13-1 at 3 (Quinn Decl. ¶ 8)), and noted that "a shooting occurred in the vicinity of the White House" on May 24, 2026, and that this "potential assassination attempt" was a "significant intervening event from when [the Secret Service] first encountered the individual holding [the] flag," *id.* (citation modified); that "the Secret Service shared information with the U.S. Department of the Interior about its ongoing investigation relating to the individual holding [the] flag," *id.* at 1–2 (citation modified); that the Secret Service has investigated or is currently investigating "over 1,300 instances of individuals using '86-47'" as a threat, *id.* at 2; that "[m]ost '86-47' investigations by the Secret Service involve online threats" and that the use of the "flag near the White House is a novel event[,]" *id.*; and, finally, that "[t]he Secret Service does not construe '86-47' to mean impeachment[,]" *id.*

36

Strikingly, only two or three of these assertions have any plausible nexus to the specific context of Plaintiff's display of the flag, and none of those assertions amounts to anything. The first relevant assertion merely notes that the Secret Service is conducting an ongoing investigation of the volunteer who spoke with the officers on May 12. *Id.* at 1–2. But the government says nothing about whether that investigation has revealed any evidence to support a true threat claim, and an investigation is just an investigation. The second and third assertions merely note that Plaintiff was displaying the flag in the same city in which the White House is located—albeit almost two miles away—and that a shooting occurred on a street near the White House on May 24. *Id.* It sweeps far too broadly, however, to suggest that anyone displaying an "8647" flag in Washington, D.C. after the May 24 shooting has made a true threat to the President's life or safety. The Court does not doubt that political violence is on the rise and that it poses a grave threat not just to the targets of the threats but to the country as a whole. But the enormity of that problem does not change the meaning of Plaintiff's speech, which, by any reasonable measure, merely advocated for the President's impeachment and removal from office—that is, "to throw [him] out." *What does 'eighty-six' mean?*, *supra*.

Since this Court granted Plaintiff's request for a TRO, Dkt. 21, and since this Court extended that TRO, Dkt. 29, Defendants have had several weeks to supplement the record with evidence or context surrounding Plaintiff's original display, which might show that a reasonable observer would have viewed Plaintiff's display of the flag as "a serious expression of an intent to commit an act of unlawful violence to a particular individual or group of individuals," *Black*, 538 U.S. at 359. In their response to Plaintiff's renewed preliminary injunction motion, Defendants now raise two additional arguments regarding the relevant context, neither of which is availing.

37

First, they contend that Plaintiff "began displaying its 86-47 messages only after widespread media reporting about people using 86-47 to convey a threat to President Donald J. Trump."  Dkt. 31 at 30 (citation modified).  For support, they point to three news articles reporting on the April 28, 2026, indictment of former Federal Bureau of Investigation Director James Comey, *see* Dkt. 31 at 12, on two counts: one alleging a violation of 18 U.S.C. § 871 (the threat statute at issue here), and one alleging a violation of 18 U.S.C. § 875, which prohibits the transmission of threatening communications in interstate commerce, *see* Indictment at 1–2, *United States v. Comey*, No. 4:26-cr-00016 (E.D.N.C. Apr. 28, 2026), ECF No. 1.  The Indictment alleges that Comey posted an image of seashells arranged to read "86 47" on social media.  *Id.*  Defendants contend that "[c]overage of this indictment was widespread, broadcasting that, among other things, 86 can mean to kill or to encourage violence against President Trump." Dkt. 31 at 12 (citation modified).

That is not, however, what the news articles reported.  Nor do these articles reveal anything about what a reasonable observer viewing Plaintiff's display of the "8647" flag, in context, would conclude.  In the first article, CNN reported that Comey "was indicted . . . over a photo of seashells [that] *officials said* threatened President Donald Trump."  Hannah Rabinowitz *et al.*, *Exclusive: Former FBI Director James Comey indicted over alleged 'threat' against Trump*, CNN (Apr. 29, 2026), https://perma.cc/R2XR-F3XF (emphasis added).  The article includes an image of Comey's Instagram post, and it states "[t]he number 86 can often refer to getting rid of or tossing something out, while 47 corresponds to Trump's current term in office as the 47th president.  Republicans claimed that it was a threat against President Donald Trump, while Comey said he 'didn't realize some folks associate those numbers with violence.'"  *Id.* Another article recounts the charges against Comey and reports that "'eighty-six' is a slang term

for 'get rid of,' and *prosecutors allege* it encourages violence against Trump, the 47th president."

Kayla Epstein & Madeline Halpert, *Comey surrenders over charge of threatening Trump's life in*

*Instagram post*, BBC (Apr. 29, 2026), https://perma.cc/4QZU-3C39 (emphasis added).  It also

reports that Comey took the image of the seashells down and posted a follow-up note that he

assumed the shells "were a political message" and that he "didn't realize some folks associate

those numbers with violence.  It never occurred to" him, but that he "oppose[s] violence of any

kind so [he] took the post down."  *Id.*  The article also reports that President Trump said, in

response to the indictment, that 86 is "a mob term for kill him," and that he believed Comey's

social media post was "probably" a threat to him.  *Id.*  The third article, from the Associated

Press, is of a similar vein, stating that Merriam-Webster "says 86 is slang meaning to throw out,

to get rid of, or to refuse service to," and like this Court, notes that the Merriam-Webster has

declined to endorse "to kill" as a meaning of the term.  Alanna Durkin Richer & Eric Tucker, *Ex-*

*FBI Director Comey indicted again, in a probe over an online post officials call a Trump threat*,

Associated Press (Apr. 28, 2026), https://perma.cc/Q4YJ-7NK6 (citation modified).  It reports

that President Trump, "in a Fox News Channel interview in May," said that Comey knew 86

"meant assassination."  *Id.*

None of these articles advance Defendants' contention that reporting regarding the

Comey prosecution altered the common usage or understanding of the term "86"—at most, they

show that the government has alleged, and other government officials have asserted, that the

term can mean "to kill."  But those assertions cannot change the common meaning of the term,

and, if anything, the articles add credence to Plaintiff's view that "86" most commonly means

"to get rid of."

39

But even putting all of this aside, Plaintiff has provided uncontroverted evidence that the premise of the government's argument is incorrect; Plaintiff did not "only" or "just" begin displaying the flag after this "widespread media reporting," Dkt. 31 at 12, 30, but, rather, purchased and began displaying the flag months earlier.  Carey attests that an Accountability Now volunteer purchased the flag on October 9, 2025, and that the flag has been displayed "on and off since" then as part of the association's routine rotation of signs.  Dkt. 33-1 at 2–3 (6th Carey Decl. ¶¶ 2–3).  In short, the timing of when Plaintiff began to display the flag would not lead a reasonable observer to conclude that it was displayed in reaction to—and presumably embracing—"widespread reporting" that "8647" constitutes a threat to the President.

Defendants' second argument warrants further discussion but does not alter the outcome. Defendants now argue that the NPS took note of and photographed a sign displayed at the demonstration site on April 14, 2026—weeks before the Secret Service and then the NPS raised concerns about the "8647" flag—which said: "PARTY AT FLARE WHEN HE'S DEAD."  Dkt. 31 at 30; Dkt. 31-2 at 6 (Sheffer Decl. Attachment 3).  By way of background, one of Plaintiff's volunteers "mad[e]" the sign and "add[ed]" it to Plaintiff's display.  Dkt. 33-1 at 5 (6th Carey Decl. ¶ 6).  Further supplementing the record, Plaintiff proffers another image, which Plaintiff's counsel informed the Court was taken on April 9, 2026, of a volunteer posing with the sign, which is placed next to another sign, encouraging passersby to "SIGN HERE! TELL CONGRESS TO IMPEACH. CONVICT. REMOVE."  *Id.*  The "PARTY AT FLARE WHEN HE'S DEAD" sign was on the other side of the sandwich board that displayed the "TRUMP RAPED LITTLE GIRLS" sign.  Dkt. 31-2 at 5–6 (Sheffer Decl. Attachment 2, 3); *see also* June 23, 2026 Hrg. Tr. (Rough at 28).

According to Plaintiff, the "PARTY AT FLARE" sign "was displayed for a couple of weeks and then rotated out."  Dkt. 33-1 at 5 (6th Carey Decl. ¶ 6).  But when asked for greater precision at oral argument, counsel acknowledged that they did not have "a clear sense of exactly when" the sign came down and that they were unable "to confirm or deny that the party sign was ever actually displayed at the same time as the flag."  June 23, 2026 Hrg. Tr. (Rough at 10–11).  Counsel was able to represent, however, that the sign "was down by [the] end of April."  *Id.* (Rough at 11).  Despite this uncertainty, there is "no evidence in the record showing that the party sign was ever displayed alongside the flag," and Accountability Now has "confirmed that" it does not intend "to display the party sign with the 8647 flag in the future."  *Id.* (Rough at 41).

Defendants do not maintain that the "PARTY AT FLARE" sign is itself a true threat.  Nor could they.  The Supreme Court confronted a similar, and, if anything, more threatening fact pattern in *Watts v. United States*, 394 U.S. 705 (1969).  In that case, the defendant, who had recently received a draft notice, stated:  "I am not going.  If they ever make me carry a rifle the first man I want to get in my sights is L.B.J."  *Id*. at 706.  The Supreme Court nonetheless rejected the notion that Watts's statement constituted a true threat and, instead, held that it constituted a "kind of political hyperbole" that must be evaluated against the backdrop of "'a profound national commitment to the principle that debate on public issues should be uninhibited, robust, and wide-open, and that it may well include vehement, caustic, and sometimes unpleasantly sharp attacks on government and public officials.'"  *Id.* at 708 (quoting *New York Times Co*., 376 U.S. at 270).  The Court, accordingly, agreed "with [the] petitioner that his only offense . . . was a kind of very crude offensive method of stating a political opposition to the President."  *Id.* (citation modified).  Here, the sign makes no threat at all but only offers the

41

type of "vehement, caustic, and sometimes unpleasantly sharp attack[]" that the First Amendment protects. *Id.* (citation modified).

Rather than arguing that the sign constitutes a standalone threat, Defendants argue that it adds context to the "8647" flag and could lead a reasonable observer to conclude that the flag is intended to convey a true threat. Dkt. 31 at 28. The principal difficulty with the government's argument is that the overall and overwhelming message the Plaintiff has conveyed, and hopes to continue to convey, is that President Trump should be removed from office by constitutional means. This one sign, which did not itself threaten violence of any kind and which Defendants did not so much as mention when they told Plaintiff to remove the flag, did not fundamentally rework the broader context of Plaintiff's demonstration: its months-long, ongoing peaceful political demonstration outside of a courthouse, Dkt. 10-2 at 2 (2d Carey Decl. ¶ 6); its several signs—including signs displayed contemporaneously with the "PARTY AT FLARE" sign— calling for the impeachment and removal of the President from office, Dkt. 33-1 at 5 (6th Carey Decl. ¶ 6); Dkt. 19; and the fact that "86" is most commonly understood to mean "remove" or "get rid of." Compounding this difficulty is the fact that despite Defendants' monitoring of the site, they offer no evidence that the sign and flag ever appeared at the same time, much less that they appeared in close proximity to one another or that they were displayed in a manner in which a reasonable observer might infer that one display referred to the other.

The uncontroverted record, accordingly, leaves no doubt that a reasonable observer would conclude that, in the context in which it was displayed, Plaintiff's flag merely urged President Trump's removal from office or otherwise conveyed a message of political opposition to the President. No reasonable observer would view Plaintiff's flag in context and conclude that it "convey[s] a real possibility that violence will follow." *Counterman*, 600 U.S. at 74 (citation

modified).  No evidence supports Defendants' contention that the flag represented an unprotected true threat on the life or physical well-being of the President of the United States. Because Plaintiff engaged and seeks to engage in core political speech, strict scrutiny applies to Defendants' restrictions.  *Reed v. Town of Gilbert*, 576 U.S. 155, 163 (2015).  Defendants have failed to show that the removal of Plaintiff's flag furthers their asserted compelling interest in "preventing and deterring political violence."  Dkt. 31 at 29.  As a result, Defendants' restriction on Plaintiff's political speech fails strict scrutiny.

In its TRO decision, the Court explained that "Defendants have yet to ascribe any conclusions to the NPS, which is the agency that directed Plaintiff to remove (that is, to 86) the flag and that admonished the association that the flag's reappearance would constitute a violation of Plaintiff's demonstration permit."  Dkt. 20 at 16 (first citing Dkt. 10-2 at 1 (2d Carey Decl. ¶ 2)).  At that time, the Court was thus left to "guess as to why the agency decided to censor Plaintiff's speech."  *Id.*  Defendants have now embraced the Court's suggestion that "the NPS decided to defer to the views of the Secret Service," *id.* (citing Dkt. 16 at 1–2).  They state that "NPS's actions [were] based on" "the Secret Service's interpretation of [Plaintiff's] '86-47' flag as threatening and inciteful" and "NPS's discussion with the Secret Service about the '86-47' flag the day before NPS ordered it taken down."  Dkt. 31 at 30–31.  The Court thus treats the "Secret Service's interpretation of [Plaintiff's] '86-47' flag as threatening and inciteful," *id.* at 30, as the Defendants' own conclusions and as their basis for censoring Plaintiff's speech.

The Court does not doubt that "Defendants have a compelling governmental interest in preventing and deterring political violence," especially against the President.  *Id.* at 29.  But for the reasons already discussed, Defendants have failed to show how removing Plaintiff's flag, which a reasonable observer would simply view as a call for the President's removal from office,

would meaningfully and lawfully further that objective.  Defendants have not shown that any of the Secret Service's over 1300 investigations into uses of "8647"—much less the Plaintiff's use of "8647" in the relevant context—have revealed that the phrase "8647" has furthered, caused, or been used in the context of political violence at all, including the recent purported assassination attempts against the President.  Dkt. 16 at 1–2 (citation modified); *see also* Dkt. 31 at 29 (noting that "[j]ust days ago, five men were arrested and charged for plotting to kill government officials and others at the White House during the Ultimate Fighting Championship 250 event").  Defendants' claim, and its evidence, *see* Dkt. 31 at 29–30 (referencing Deputy Director Quinn's declaration and the "widespread media reporting"), amount to an assertion that they may censor any public use of "8647" at or within a mile or two of the White House because *they believe* that this speech is unprotected, regardless of the specific context in which the phrase appears, regardless of the speaker's intent, and regardless of how a reasonable viewer would understand the phrase.  As with obscenity, the strict scrutiny inquiry does not sanction such an "arguable" or *ipse dixit* true threat exception to the First Amendment.

　　　　a.   Incitement

Defendants also contend that displaying the "8647" flag constitutes criminal incitement and that the speech is unprotected by the First Amendment for this reason as well.  Dkt. 13 at 2.  Notably, the NPS's direction that Plaintiff remove the flag was premised on 18 U.S.C. § 871 alone and not on a theory of criminal incitement, and Defendants have offered no reason to believe that the NPS premised its decision on a theory of incitement.  In the Court's prior decision, it noted that "there is reason to doubt that the agency can defend its action based on a theory that appeared first in litigation."  Dkt. 20 at 17 (citing *Grace v. Barr*, 965 F.3d 883, 903 (D.C. Cir. 2020)).  As noted above, the "Government['s] justifications for interfering with First Amendment rights must be genuine, not hypothesized or invented *post hoc* in response to

44

litigation." *Kennedy*, 597 U.S. at 543 n.8 (citation modified).  But the Court need not rest its decision on this ground because, in any event, Defendants' incitement theory fails as a matter of law.

Although words of "incitement" are unprotected by the First Amendment, this category of speech is narrowly defined to include words that are "directed [at] inciting or producing *imminent* lawless action *and* [that are] likely to incite or produce such action." *Brandenburg v. Ohio*, 395 U.S. 444, 447 (1969) (per curiam) (emphasis added).  Like true threats, "incitement inheres in particular words used in particular contexts[.]" *Counterman*, 600 U.S. at 76.  But incitement "demand[s] more" than even true threats: it requires the speaker to have "specific intent, presumably equivalent to purpose or knowledge." *Id.* at 81 (citation modified).

For many of the reasons already discussed, the uncontroverted evidence shows that Plaintiff displayed the "8647" flag to urge that Congress impeach and remove President Trump from office.  Dkt. 15 at 2; Dkt. 10-2 at 2 (2d Carey Decl. ¶ 6).  The record contains no evidence that a reasonable observer would have viewed the flag as an incitement to imminent violence or that Plaintiff intended to incite political violence.  National reporting that certain *government officials* view the phrase "8647" as a threat to the President does not make it so, and certainly does not turn Plaintiff's use of that phrase into something that it is not.  Dkt. 31 at 12, 30.  *Ipse dixit* is never sufficient to prove a point, and *ipse dixit* offered by the government to justify its suppression of speech is distinctly problematic.  Nor does the fact that Plaintiff displayed a sign touting a "PARTY AT FLARE WHEN HE'S DEAD" at some point in time—perhaps at the same time the "8647" flag was displayed, but perhaps not—transform Plaintiff's display of the flag into a purposeful or intentional encouragement of "*imminent* lawless action." *Brandenburg*, 395 U.S. at 447 (emphasis added).

The most that Defendants can muster is a declaration from Deputy Director Quinn attesting that *he believes* that the term "86-47[,] . . . as it is understood today, *can* incite violence by others." Dkt. 13-1 at 3 (Quinn Decl. ¶ 8) (emphasis added). But *Brandenburg* does not refer to words that "can incite" imminent lawlessness—it refers to words that are "likely to incite," 395 U.S. at 447—and Defendants do not even suggest that Plaintiff's flag comes close to satisfying that demanding standard. In this respect, it bears note that the Secret Service knew about Plaintiff's flag, *see generally* Dkt. 15, yet permitted Plaintiff to continue to display it for more than two weeks. Dkt. 10-2 at 1–2 (2d Carey Decl. ¶¶ 2, 4). The fact that the Secret Service took no action for two weeks is difficult to reconcile with the premise that the flag was, on the government's *post hoc* telling, "directed [at] inciting or producing *imminent* lawless action and [was] *likely to* incite or produce such action," *Brandenburg*, 395 U.S. at 447 (emphasis added). Defendants' (or the Secret Service's) apparent lack of urgency around Plaintiff's display, combined with the fact that it failed to "raise[] concerns along these lines in its contemporaneous correspondence with" Plaintiff, provides further credence to the conclusion that the Defendants' justification is not "genuine," and cannot be the basis for strict scrutiny review. *Kennedy*, 597 U.S. at 543 n.8 (citation modified).

Finally, as the Supreme Court recently explained in *Counterman*, the Court's incitement decisions require that the speaker act with the "specific intent" to incite imminent violence. 600 U.S. at 81. These decisions do so because the Court has "recognized that incitement to disorder is commonly a hair's-breadth away from political advocacy—and particularly from strong protests against the government and prevailing social order"—and history has demonstrated the importance of avoiding "a chilling effect" that can deter core political speech. *Id.* (citation modified). Here, however, the record is one-sided; the only evidence before the Court—which is

46

uncontroverted—shows that Plaintiff lacked the requisite specific intent to incite violence of any kind. When first approached by the Secret Service, for example, the volunteer displaying the flag was emphatic that she held no "ill-will towards" the President and wanted him "to live forever." Dkt. 15 at 2. Similarly, Carey has attested that she wants "President Trump to live a long and healthy life at Mar-a-Lago *after* he is impeached" and removed from office. Dkt. 33-1 at 4–5 (6th Carey Decl. ¶ 6) (emphasis in original). The Court, to be sure, need not accept Plaintiff's attestations at face value. But, here, the government agrees that the material facts are undisputed, and it offers not even a scintilla of evidence that might controvert Plaintiff's evidence.

*   *   *

The Court, accordingly, concludes that Plaintiff's "8647" flag is protected speech and grants summary judgment to Plaintiff as to its First Amendment claim challenging the NPS's request that it remove the "8647" flag or face revocation of the existing permit.

## C.    Remedy

Having concluded that Plaintiff is entitled to judgment, the Court turns to the question of remedy. Plaintiff seeks a declaratory judgment and a permanent injunction barring Defendants and their delegees "from revoking Plaintiff's demonstration permit or seizing or destroying its property based on its display of the signs or flag," Dkt. 9 at 7–8 (Am. Compl., Requested Relief), or "any signs or banners with substantially similar messages" or "any similar flags or signs containing the phrase '8647,'" Dkt. 27-2 at 1–2 (Proposed Order). The Court considers each of these forms of requested relief in turn.

*First*, for the reasons explained above, the Court will enter a judgment declaring that Plaintiff's display of the two signs accusing President Trump of raping a minor and the "8647"

47

flag depicted at Dkt. 8-1 at 2 (Carey Decl. ¶ 4) and Dkt. 10-2 at 2 (2d Carey Decl. ¶ 3), respectively, constitutes political speech protected by the First Amendment.

*Second*, the Court will permanently enjoin Defendants from requiring Plaintiff to remove these three displays, from revoking Plaintiff's demonstration permit based on these displays, and from taking any other adverse action against Plaintiff for displaying these materials. A plaintiff seeking a permanent injunction must prevail on the merits and must also "satisfy a four-factor test before a court may grant such relief." *Anatol Zukerman & Charles Krause Reporting, LLC v. U.S. Postal Serv.*, 64 F.4th 1354, 1364 (D.C. Cir. 2023) (quoting *eBay Inc. v. MercExchange, L.L.C.*, 547 U.S. 388, 391 (2006)). It must demonstrate "(1) that it has suffered an irreparable injury; (2) that remedies available at law, such as monetary damages, are inadequate to compensate for that injury; (3) that, considering the balance of hardships between the plaintiff and defendant, a remedy in equity is warranted; and (4) that the public interest would not be disserved by a permanent injunction." *Id.* (quoting *eBay*, 547 U.S. at 391). When the defendant is the government, the third and fourth factors typically merge. *Id.*

Entry of a permanent injunction is appropriate here because Plaintiff has suffered and will suffer irreparable harm—the inability to engage in protected expression without fear of losing its demonstration permit—in the absence of injunctive relief. *See Pursuing Am.'s Greatness v. Fed. Election Comm'n*, 831 F.3d 500, 511 (D.C. Cir. 2016) ("The loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury." (citation modified)). Damages, moreover, would not adequately redress Plaintiff's First Amendment injury. Finally, because the government lacks any legitimate interest in the unconstitutional content-based censorship of political speech, the Court is persuaded that the balance of hardships and the public interest weigh in favor of granting injunctive relief. *See,*

48

*e.g.*, *Gordon v. Holder*, 721 F.3d 638, 653 (D.C. Cir. 2013) (acknowledging "the obvious: enforcement of an unconstitutional law is always contrary to the public interest").

*Third*, Plaintiff also seeks an injunction barring Defendants and their delegees from interfering with its right to display "substantially similar signs and flags[.]"  Dkt. 34 at 22; *see also* Dkt. 27-2 at 1–2 (Proposed Order).  Defendants object, arguing that "[a]ny injury with respect to [these additional signs] is conjectural, speculative, and hypothetical, so [Plaintiff] does not have standing to seek an injunction with respect to them or the various other displays."  Dkt. 31 at 33–34.  The Court is unpersuaded that Plaintiff's request for this relief implicates issues of justiciability, as opposed to the scope of the Court's remedial authority.  Defendants have told Plaintiff that it must remove its signs referring to rape of minors and its "8647" flag or face further consequences, Dkt. 8-1 at 2–3 (Carey Decl. ¶¶ 5–7); Dkt. 10-2 at 1 (2d Carey Decl. ¶ 2), and Plaintiff has, accordingly, established "a credible threat of enforcement" based on substantially indistinguishable materials containing those same references, *Susan B. Anthony List*, 573 U.S. at 159.  Standing is not the problem.  The Court's remedial authority, moreover, includes the authority to prevent circumvention of the Court's decision and to ensure that future violations do not merely resurrect the controversy the Court has resolved.  As the Supreme Court has explained:

> The purpose of an injunction is to prevent future violations, and, of course, it can be utilized even without a showing of past wrongs.  But the moving party must satisfy the court that relief is needed.  The necessary determination is that there exists some cognizable danger of recurrent violation, something more than the mere possibility which serves to keep the case alive. The [district court's] decision [must be] based on all the circumstances; [the district court's] discretion is necessarily broad and a strong showing of abuse must be made to reverse it.

*United States v. W.T. Grant Co.*, 345 U.S. 629, 633 (1953) (citation omitted); *see also Anatol Zukerman and Charles Krause Reporting, LLC*, 64 F.4th at 1363–64 (D.C. Cir. 2023) (same).  At

the same time, however, the Court is mindful that "an injunction must be narrowly tailored to remedy the harm shown." *J.D. v. Azar*, 925 F.3d 1291, 1335 (D.C. Cir. 2019) (citation modified).

Here, the Court is persuaded that the injunction should apply both to the signs and flag that Defendants have characterized as "obscene as to minors," a "true threat," and unlawful incitement and to all substantially similar displays. Plaintiff includes, as examples of other signs it seeks to display, a sign featuring an anthropomorphic racoon holding an "8647" flag above another sign, which says "CONVICT. REMOVE," and an "8647" flag that looks much like the flag at issue, although it adds the phrase "IMPEACH TRUMP." Dkt. 27-1 at 1–2 (5th Carey Decl. ¶¶ 3, 5). Plaintiff also includes, as another example, a banner reading "TRUMP ASSAULTS CHILDREN OBVIOUSLY," which an NPS official has recently "examined." *Id.* at 2 (5th Carey Decl. ¶ 4). These displays implicate the "most sacred of rights[,]" *Sec. & Exch. Comm'n v. Musk*, No. 25-cv-105, 2026 WL 279790, at *4 (D.D.C. Feb. 3, 2026)—Plaintiff's First Amendment right to engage in core political speech in a public forum—and even a brief interference with that right comes at a grave price to Plaintiff, in particular, and the public interest, more broadly. Because these displays fall well within the heartland of First Amendment-protected speech, providing some breathing room for substantially similar displays would pose little risk of impinging on any legitimate enforcement prerogatives that the NPS might have. On the other hand, it would ask too much to require Plaintiff to return to Court to obtain judicial sanction each time it seeks to display indistinguishable materials without facing the very real risk of the loss of its permit.

But, at the same time, the Court recognizes that context matters and that the Court cannot, and ought not, pass on the constitutionally protected status of future displays without that context

in mind.  For that reason, the Court cannot enjoin Defendants from taking action with respect to materials that differ in material respects from the signs and flag at issue and that are displayed in a materially different context.  The Court will, accordingly, issue an injunction that goes beyond the specific signs and flag at issue, but only slightly so.  By way of example, the Court has little difficulty in concluding that the sign depicting the racoon holding an "8647" flag, Plaintiff's new "8647" flag, which adds the phrase "IMPEACH TRUMP," and its banner asserting "TRUMP ASSAULTS CHILDREN OBVIOUSLY" are substantially similar to the materials at issue and are displayed in a similar context.  *See* Dkt. 27-1 at 1–2 (5th Carey Decl. ¶¶ 3–5).  But materials that go beyond innocuous and immaterial differences of this type would present distinct issues, which the Court cannot—and does not—address in the abstract.

In short, the Court concludes that a narrowly-tailored injunction should preclude (1) the destruction or seizure of substantially similar displays and signs displayed in a substantially similar context to that which existed at the time of Plaintiff's initial displays and (2) the revocation of Plaintiff's demonstration permit in response to such displays.  The examples provided above—as well as common sense—should guide the parties in determining whether a display is substantially similar to the displays at issue.  But to avoid any uncertainty, the Court emphasizes that the injunction applies only to materials that make non-substantive alterations to the messages at issue.  Placing an "8647" flag in the hand of a racoon does not change the message, nor does adding a reference to impeaching the President to an "8647" flag.  Beyond alterations of that limited and non-substantive nature, however, the Court cannot express a view and does not intend to enjoin Defendants.

51

52

**CONCLUSION**

For the foregoing reasons, the Court will GRANT Plaintiff's motion for summary

judgment, Dkt. 27.  The Court will **PERMANENTLY ENJOIN** Defendants, their agents and

employees, and all persons acting in concert with them, from threatening to revoke Plaintiff's

demonstration permit as a result of Plaintiff's display of the signs and flags described above, or

of any displays with substantially similar messages displayed in a substantially similar context,

or otherwise seizing or destroying the aforementioned displays.

A separate order will follow.

/s/ Randolph D. Moss
RANDOLPH D. MOSS
United States District Judge


Date:  June 29, 2026